186 N.J. Super. 335 (1982)
452 A.2d 689
JOHN W. BISBEE, JR. AND ADELAIDE C. BISBEE, PLAINTIFFS-APPELLANTS,
v.
JOHN C. CONOVER AGENCY, INC., A CORPORATION, JOHN C. CONOVER AND ASBURY PARK PRESS, INC., A CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 29, 1982.
Decided October 20, 1982.
*337 Before Judges FRITZ, JOELSON and PETRELLA.
Richard D. McOmber argued the cause for appellants (McOmber & McOmber, attorneys; Jeffrey M. Nolen on the brief).
Richard M. Eittreim argued the cause for respondent Asbury Park Press, Inc. (McCarter & English, attorneys).
Walton W. Kingsbery III appeared on behalf of respondent John C. Conover Agency, Inc. (Richard A. Amdur, attorney) and relied on the brief submitted by Asbury Park Press, Inc.
The opinion of the court was delivered by PETRELLA, J.A.D.
*338 Plaintiffs filed a complaint in four counts against defendants, essentially alleging invasion of their privacy, wrongful publicity of private facts, holding them out in a false light in the public eye and wrongful appropriation of facts about them for a commercial purpose. The trial judge granted summary judgment in favor of defendants. We affirm.
John W. Bisbee, Jr. and his wife Adelaide purchased a house in Ocean Township in January 1979. The sale had been arranged through a local real estate broker, John C. Conover, and his firm, the John C. Conover Agency, Inc. (Conover).
In July 1979 the Asbury Park Press (Press) printed an article on the sale accompanied by a photograph of the house. The article was captioned "Ocean Township Estate Sold for About $250,000," and appeared in the newspaper's weekly real estate section. It gave the property address, the number of rooms and described appointments within the house; John Bisbee was named as purchaser (omitting his wife), and John Bisbee's position as a bank vice-president was mentioned. The history of the building was noted, as well as the fact that the transaction had been consummated through Conover.
The photograph was taken without the knowledge of the Bisbees, and Conover had prepared the press release without consulting them.
Although other states and some New Jersey trial courts[1] have examined the various tort causes of action for invasion of privacy, see, generally, Prosser, Law of Torts (4 ed. 1971), § 117 at 802-818, these issues have not been closely scrutinized by our appellate courts.

*339 I
Summary judgment is proper where there is no factual dispute. R. 4:46-2; Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954). Although the general phrase, "invasion of privacy," has loosely been applied to all of the grounds for relief claimed by plaintiffs in their complaint, the first three counts are discussed together because they do not have to involve the element of a use of the information for defendant's advantage.
The Restatement of Torts lists the four areas of invasion of privacy as generally including (a) unreasonable intrusion, (b) appropriation of the other's name or likeness, (c) unreasonable publicity given to one's private life and (d) publicity that normally places the other in a false light before the public. 3 Restatement, Torts 2d, § 562A at 376 (1977). It defines the tort of invasion of privacy, which deals with unreasonable intrusion upon the seclusion of another, as follows:
One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. [Id., § 652B at 378]
As § 652B states, a person's liability attaches when plaintiff's privacy is infringed "physically or otherwise." Thus, while a physical, common law trespass might constitute an invasion of privacy, even lesser action without any physical contact or violation might give rise to the cause of action. In 3 Restatement, op. cit., § 652B, comment b at 378-379, the observation is made:

b. The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents. The intrusion itself *340 makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.
The thrust of this aspect of the tort is, in other words, that a person's private, personal affairs should not be pried into. See, e.g., Prosser, op. cit., § 117 at 807-808. The converse of this principle is, however, of course, that there is no wrong where defendant did not actually delve into plaintiff's concerns, or where plaintiff's activities are already public or known. Id. at 808-809. It can accordingly be seen that plaintiff's first count must fail, both because reasonable men could not find any highly offensive intrusion upon the Bisbees here, and because all of the matters at issue herein were otherwise known and public. The photograph which the Press printed was taken from the street, a public thoroughfare, and merely represented a view which is available to any bystander. Most of the facts in the article are matters of public record, readily available to anyone who would wish to ascertain them.[2] For instance, the deed and the acknowledgment thereto must contain the true consideration as required for recording by N.J.S.A. 46:15-6. The realty transfer fee imposed by N.J.S.A. 46:15-7 is endorsed on the deed by the recording officer and that amount also reflects the consideration paid for the purchase. Defendants did nothing wrongful in obtaining or compiling this information.
Plaintiff's second count likewise fails. To sustain a cause of action for giving publicity to a private life, a plaintiff must show that the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized. See 3 Restatement, Torts 2d, § 652D at 383. The limits of this form of invasion of privacy are cogently set forth by Prosser:

*341 The final limitation is that the matter made public must be one which would be offensive and objectionable to a reasonable man of ordinary sensibilities. The law is not for the protection of the hypersensitive, and all of us must, to some reasonable extent, lead lives exposed to the public gaze. Anyone who is not a hermit must expect the more or less casual observation of his neighbors and the passing public as to what he is and does, and some reporting of his daily activities. The ordinary reasonable man does not take offense at mention in a newspaper of the fact that he has returned home from a visit, or gone camping in the woods, or given a party at his house for his friends. It is quite a different matter when the details of sexual relations are spread before the public eye, or there is highly personal portrayal of his intimate private characteristics or conduct. [Prosser, op. cit., § 117 at 811-812, footnotes omitted]
The Bisbee complaint substantially fails all three of the criteria mentioned above. The only items in the Press article, not matters of public record and even arguably private, were the number of rooms in the house and their arrangement.[3] Why public knowledge of such facts should be offensive has not been demonstrated, notwithstanding Bisbee's assertion that, as a banker, he has a certain greater need for seclusion.[4] Moreover, the article can be seen as being within the interest of the public:[5] the house was formerly an "estate" and apparently in the nature of a local historic landmark. Thus, even the purchase price and the fact that a ranking financial officer had bought it may well be of concern to local inhabitants and property owners. Furthermore, since the article appeared in a weekly real estate section, the identity of the real estate broker was a legitimate item of news to those engaged in the real estate business as well as others.
Plaintiffs' next-to-last count is for publicity which allegedly places plaintiffs in a false light in the public eye. See, generally, Prosser, Law of Torts, § 117 at 812-814. This tort *342 form of invasion of privacy is analagous to defamation, in that the statement which gives rise to the cause of action must be untrue. See Cibenko v. Worth Publishers, Inc., 510 F. Supp. 761 (D.N.J. 1981); Devlin v. Greiner, 147 N.J. Super. 446 (Law Div. 1977); see also, 3 Restatement, Torts 2d, § 652E and comments a and b at 394-395. There is the further requirement that the false light in which the other is placed would be highly offensive to a reasonable person. As there is no dispute as to the truth of the Press article, and omission of the wife as an owner does not make the article untrue, this count does not establish a cause of action. Plaintiff's hypothesis that readers were given an impression that plaintiffs were interested in wealth and affluence is pure speculation, unsupported in the record. See R. 4:46-5(a). Furthermore, in our view reasonable men could not find the article offensive.

II
The last count of plaintiffs' complaint asserts that defendants appropriated facts about them, the Bisbees, for their own use, benefit and profit.
Restatement, Torts 2d, in § 652C provides that "one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other...." Comment d to this section observes:

Incidental use of name or likeness. The value of the plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities; nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity. No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation. It is only when the publicity is given for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness that the right of privacy is invaded. The fact that the defendant is engaged in the business of publication, for example of a newspaper, out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or likeness. Thus a newspaper, although it is not a philanthropic institution, does not become liable under the rule stated in this Section to every person whose name or likeness it publishes.
*343 In other words, mere publicity is not actionable; it must be shown that defendant acted with a commercial purpose or otherwise sought some benefit from revealing information about plaintiffs. The issue is further complicated because of the existence of a limited privilege[6] held by the Press.
The privilege of giving publicity to news, and other matters of public interest, was held to arise out of the desire and the right of the public to know what is going on in the world, and the freedom of the press and other agencies of information to tell it. "News" includes all events and items of information which are out of the ordinary humdrum routine, and which have "that indefinable quality of information which arouses public attention." To a very great extent the press, with its experience or instinct as to what its readers will want, has succeeded in making its own definition of news, as a glance at any morning newspaper will sufficiently indicate. It includes homicide and other crimes, arrests and police raids, suicides, marriages and divorces, accidents, a death from the use of narcotics, a woman with a rare disease, the birth of a child to a twelve year old girl, the reappearance of one supposed to have been murdered years ago, and undoubtedly many other similar matters of genuine, if more or less deplorable popular appeal.
The privilege of enlightening the public was not, however, limited to the dissemination of news in the sense of current events. It extended also to information or education, or even entertainment and amusement, by books, articles, pictures, films and broadcasts concerning interesting phases of human activity in general, as well as the reproduction of the public scene in newsreels and travelogues. In determining where to draw the line the courts were invited to exercise a species of censorship over what the public may be permitted to read; and they were understandably liberal in allowing the benefit of the doubt.
Caught up and entangled in this web of news and public interest were a great many people who had not sought publicity, but indeed, as in the case of any accused criminal, had tried assiduously to avoid it. They had nevertheless lost some part of their right of privacy. [Prosser, op. cit., § 118 at 824-825, footnotes omitted]
Had there been a consideration of substance in either direction for this publication as a news story, this might be a different case.
Plaintiffs' theory here is that defendants "exploited" the fact of the sale by publicizing it, and that this publicity redounded to defendants' benefit. Perhaps it would have been more *344 prudent for the Press to have sought plaintiffs' consent, or to have omitted reference to Mr. Bisbee's employment. However, as we have explained, the transaction was already public and the information available to anyone who sought it. Defendants' actions, even if minimally violative of plaintiffs' interest in the nondisclosure of Bisbee's occupation, were solely incidental to the news aspects of the sale and under the facts of this case are not sufficient to present a jury question.
Affirmed.
NOTES
[1] See Cibenko v. Worth Publishers, Inc., 510 F. Supp. 761, 766-767 (D.N.J. 1981); Devlin v. Greiner, 147 N.J. Super. 446, 461 (Law Div. 1977); Canessa v. Kislak, Inc., 97 N.J. Super. 327, 330 (Law Div. 1967), and Palmer v. Schonhorn Enterprises, Inc., 96 N.J. Super. 72 (Ch.Div. 1967).
[2] Even Mr. Bisbee's employment with a bank may apparently be available through inquiries in the neighborhood, visiting his bank, or from trade or professional directories.
[3] Eleven rooms, 4 1/2 baths, four fireplaces, etc.
[4] We need not now address whether offensiveness is determined by the standards of a reasonable person or those of a person in plaintiff's position.
[5] Publication of newsworthy items would seem moreover to be protected by the First Amendment's guarantee of freedom of the press.
[6] This limited privilege is intertwined with the protection afforded by the First Amendment (U.S. Const., Amend. I).