Edward TELLADO, Plaintiff,

v.

TIME–LIFE BOOKS, INC., Wide-World Photos, Inc., and John Does I–IV, Defendants.

Civ. A. No. 85–3100.

United States District Court, D. New Jersey.

Sept. 3, 1986.

Andrew V. Clark, Byron M. Verosloff, Seaman, Clark, Levine and Addy, Perth Amboy, N.J., for plaintiff.

Peter G. Banta, Donald A. Klein, Corinne M. Mullen, Winne, Banta, Rizzi, Hetherington & Basralian, Hackensack, N.J., for defendants Time-Life Books, Inc. and Wide-World Photos, Inc.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is an action for invasion of privacy and misappropriation of likeness. Plaintiff originally filed this suit in the Superior Court of New Jersey, Law Division, Middlesex County. Defendants removed the action to this court pursuant to 28 U.S.C. § 1441. Jurisdiction in this court is based on diversity of citizenship.

Defendants have now brought a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is not to be granted unless, after all reasonable inferences are drawn in favor of the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. See *Sames v. Gable,* 731 F.2d 49, 52 (3d Cir.1984). Although there is a serious dispute here as to the application of the law, there is essentially no dispute as to the following facts. Plaintiff, Edward Tellado, served as a Private E–2 First Class in the United States Army during the Vietnam War. In 1966, during a search and destroy mission in Ta Nin, Vietnam, a photograph was taken of Mr. Tellado with a few other infantrymen. They were coming off of a forced march and had just moments ago been through a fierce thirty-minute battle. They were still under sniper fire from the enemy and were waiting for an evacuation helicopter. Six soldiers had been killed and twelve wounded in the battle. The parties agree that the photograph accurately reflects plaintiff's sense of anguish, agony and fear at the time.

The photograph was taken by Henri Huet, a staff photographer for the Associated Press. Huet was later killed in Vietnam. Defendant World-Wide Photos, Inc. acquired the original of the photograph at some point after it was taken. The right to use the photograph was obtained from World-Wide by defendant Time-Life Books and, before that, by Boston Publishing, Inc., originator and publisher of the Time-Life series *The Vietnam Experience.* No release was ever obtained from Mr. Tellado by anyone at anytime for the use of this photograph and no payment has ever been made to him for such use.

*The Vietnam Experience* is a multi-volume series of illustrated books concerning the war in Vietnam that is presently being distributed serially by defendant Time-Life. The photograph at issue was first used by Boston Publishing Company in an insert in the first volume of the series, entitled *Setting the Stage,* published in 1981. This insert was a letter from the publisher describing the series and the continuing importance of the history of the Vietnam War. Enclosed with the publisher's letter was a survey form seeking readers' responses to the first volume and ideas for subsequent volumes. The photograph of Mr. Tellado appeared on the last page of the publisher's letter with the following caption:

> THE FACES OF BATTLE. U.S. infantrymen, some of them wounded, some dazed, and most of them frightened, await helicopter evacuation moments af-

ter a fierce fire fight. During the battle, six were killed and twelve wounded.

In 1982 Boston Publishing issued another brochure, describing *The Vietnam Experience* series, emphasizing its extensive photographic portrayal of the Vietnam War. Photographs from the first six volumes of the series were reproduced. Mr. Tellado's photograph appeared on the back page of the brochure with a caption similar to that in the first publication.

The photograph subsequently appeared in various promotional materials issued by Time-Life in connection with *The Vietnam Experience* series such as brochures advertising the series, an advertisement in "TV-Cable Week" and on the outside envelope of a brochure advertising the series. Five million copies of the brochure were sent out of the kind that Mr. Tellado found in the garbage can.

It was this brochure envelope that first brought the use of the photograph to Mr. Tellado's attention. Mr. Tellado works as a janitor for Merck and Company in New Jersey. He was emptying out a trash can and as he looked into it he saw a picture of himself in the bottom of the garbage can. Mr. Tellado had no question in his mind that the picture was of him. Indeed, no one disputes that fact. The picture was not crumpled in anyway and the envelope had never been opened. Mr. Tellado is in the center right of the photo with rosary beads around his neck that his mother gave him. When Mr. Tellado saw the picture he states that he panicked. He picked the picture up and put it down a few times. In describing his feelings in his deposition, he stated:

> I was kind of freaked out. Here I look in a trash can, almost 20 years later and I see myself there. Here's something that I've been trying to avoid for the past 19 years and all of a sudden I find myself back under the same situation.

Tellado dep. at 24–25.

Mr. Tellado tacked the picture up in the janitor's closet, but did not bring it to anybody's attention at work for two or three weeks. He told his wife about the picture six or seven days later and brought it home to show her at her request. Mr. Tellado contends that he had a great fear of re-experiencing the emotional trauma of his experiences in Vietnam and had avoided anything that might remind him of those experiences. He had experienced periods of depression and flashbacks after he returned home from the war and contends that the photograph brought on a fear of returning to that state of mind.

Defendant contends the use of this photograph of a newsworthy event cannot form the basis for a misappropriation claim because the photograph was not used for the purposes of taking advantage of plaintiff's reputation, prestige or other value associated with him, for purposes of publicity. Defendant also contends that there is no basis for plaintiff's invasion of privacy claim because the photograph was taken in a clearly public setting and publication cannot be construed as offensive to a reasonable person.

As this is a diversity action, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this court is to make an informed prediction as to how the New Jersey Supreme Court would rule on this issue if this case were before it. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981). Although there are numerous New Jersey decisions concerning misappropriation of likeness and invasion of privacy claims, the New Jersey Supreme Court has not specifically addressed a situation such as the instant one. The Third Circuit has stated:

> In the absence of an authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how that court would rule. To make this prognostication, we are not inflexibly confined by dicta or by lower state court decisions, although we should look to such statements as indicia of how the state's highest court might decide. *See McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662 (3d Cir.1980). The policies underlying the applicable le-

gal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts may also inform our analysis. In addition, we may consult treatises, the Restatement, and the works of scholarly commentators.

*Pennsylvania Glass* at 1167.

Although early court decisions refer only generally to the right of privacy, more recent caselaw, and more importantly here, New Jersey law now treats each kind of invasion of privacy differently and has adopted the distinctions and definitions of the Second Restatement of Torts. As summarized in *Bisbee v. John C. Conover Agency*, 186 N.J.Super. 335, 339, 452 A.2d 689 (App.Div.1982):

> The *Restatement of Torts* lists the four areas of invasion of privacy as generally including (a) unreasonable intrusion, (b) appropriation of the other's name or likeness, (c) unreasonable publicity given to one's private life and (d) publicity that normally places the other in a false light before the public. 3 Restatement, Torts 2d, § 562A at 376 (1977).

I will, therefore, maintain these distinctions in discussing plaintiff's claim. Plaintiff's complaint refers in Count 1 to misappropriation of likeness and in Count 2 only generally to "invasion of privacy." I can only conclude that Count 2 refers to the three areas of the invasion of privacy tort other than misappropriation of likeness as otherwise it would be dismissed as superfluous. I accordingly turn first to those other areas before discussing Count 1's misappropriation claim. If plaintiff's "invasion of privacy" claim in Count 2 refers to the tort of unreasonable intrusion, defendants' motion for summary judgment is granted as to that claim.

The *Restatement (Second) of Torts*, Section 652B (1977), defines the tort of unreasonable intrusion as follows:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

■ Defendants did not intrude upon the solitude or seclusion of the plaintiff. The photograph that was published depicts plaintiff and other soldiers during a combat mission in Vietnam—a clearly public setting.

In *Bisbee*, which is discussed in more detail later, the court rejected an unreasonable intrusion claim because the facts and photograph publicized were public.

This aspect of plaintiff's claim is accordingly dismissed. Should plaintiff be stating a claim for unreasonable publicity given to one's private life, it would fail for the same reason.

While plaintiff does not appear to be making a claim for false light publicity, it is not entirely clear what he intends by including a second count for invasion of privacy, so I will rule on any possible false light claim also.

In order for liability to be imposed for publicity that places another in a false light, the *Restatement* requires that:

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and [that]

> (b) the actor had knowledge of and acted in reckless disregard as to the falsity of the publicized matter.

It is essential, moreover, that "the matter publicized be untrue, although it is not necessary for the matter to be defamatory." *Cibenko v. Worth Publishers, Inc.*, 510 F.Supp. 761, 766 (D.N.J.1981).

There is no allegation here that anything about the photograph is untrue or that plaintiff has been placed in a false light. If anything, the stark reality of what the photograph portrays is what has been most disturbing to plaintiff. Plaintiff has stated in his deposition that the photograph is an accurate portrayal of him. Defendants' motion for summary judgment as to Count 2 of the complaint is granted as there are no facts present which would support plaintiff's claim under any theory other than that stated in Count 1.

Plaintiff's misappropriation claim is at the heart of this case and is a much more complicated issue than the above claims. Section 652C of the Restatement, Torts, 2d provides that "one who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other."

Prosser has described this tort as follows:

Although the element of protection of the plaintiff's personal feelings is obviously not to be ignored in such a case, the effect of the appropriation decisions is to recognize or create an exclusive right in the individual plaintiff to a species of trade name, his own, and a kind of trade mark in his likeness.

*See* Prosser and Keeton on Torts, 5th edition, (1984) § 117 at 854.

The cases in this area have turned on such factors as whether the event reported was public or private and whether the use was predominantly commercial or of news or historic value.

Two cases arising out of similar facts illustrate the distinction the New Jersey courts make between private facts and public facts. In *Canessa v. J.I. Kislak*, 97 N.J.Super. 327, 235 A.2d 62 (Law Div.1967), a real estate agent offered to assist a large family who had been having difficulty finding an affordable home. Through the real estate agent's efforts, the family found a home. The agent then contacted the *Jersey Journal* and asked if they would be interested in running a story on the family. The family granted their permission, and the *Journal* printed a story, including a picture of the family, which was complimentary to the real estate agency. The agency then had reprints of the articles made and imprinted their name and address on them and distributed them as advertising brochures.

Plaintiff brought suit for misappropriation of likeness and invasion of privacy. The trial court denied defendants motion for summary judgment because it found that plaintiff had made out a case for misappropriation and invasion of privacy.

In another case, also arising out of a real estate agency's efforts to obtain favorable publicity, the court reached an opposite conclusion. In *Bisbee v. John C. Conover Agency*, cited *supra*, the agency had been successful in selling an estate in Ocean Township. The *Asbury Park Press* then published an article based on the agency's press release which gave the selling price of the estate, the property address, the number of rooms and a description of the appointments in the house. The name of the purchaser and his occupation were mentioned and the history of the building was noted. The fact that the sale was made by the agency was, of course, also mentioned.

The Court found the defendants were not liable under a misappropriation or right to privacy theory because the items in the article were either matters of public record or were in the interest of the public because the house was formerly an estate and of some historic value.

A third case, decided more recently, also highlights the distinction between commercial use of private information and commercial use of information which is of a public or historic nature. In *Faber v. Condecor, Inc.*, 195 N.J.Super. 81, 477 A.2d 1289 (App.Div.1984), a manufacturer of picture frames had used a family's photograph in frames displayed for sale without their permission. Plaintiff had agreed to the use of their family photograph in a Kodak booklet illustrating photography techniques, but had not allowed any further use. The court found that plaintiffs had established a cause of action for invasion of privacy and misappropriation because defendants used their picture solely for trade purposes and for no other reason. *Faber* at 88, 477 A.2d 1289. The court stated:

This use cannot be compared to use of a photograph in a magazine article, as opposed to an advertisement in that magazine. *Id.*

One last case completes the analysis New Jersey law has made of misappropriation of likeness claims. In *Palmer v. Schonhorn Enterprises, Inc.*, 96 N.J.Su-

per. 72, 232 A.2d 458 (Ch.Div.1967), several internationally famous professional golfers who sued for misappropriation of likeness based on the use of their names in connection with and as part of a game.

The Court in *Palmer* stated that the use of plaintiff's names for the purpose of capitalizing upon them in connection with a commercial project rather than the dissemination of news or articles or biographies was actionable. *Id.* at 79, 232 A.2d 458.

The court stated:

There is little doubt that a person is entitled to relief when his name has been used without his consent, either to advertise the defendant's product or to enhance the sale of an article. *Id.* at 77, 232 A.2d 458.

The court also quoted from a New York case, *Gautier v. Pro-Football, Inc.*, 304 N.Y. 354, 107 N.E.2d 485 (Ct.App.1952) as follows:

While one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information.

*Palmer*, 96 N.J.Super. at 78, 232 A.2d 458.

It would therefore seem, from a review of the authorities, that although the publication of biographical data of a well-known figure does not *per se* constitute an invasion of privacy, the use of that same data for the purpose of capitalizing upon the name by using it in connection with a commercial project other than the dissemination of news or articles or biographies does.

*Id.* at 79, 232 A.2d 458.

While defendants emphasize that *Palmer* concerned the use of the names of individuals who had celebrity status and, thus, commercial value to the use of their names or pictures, I do not find that New Jersey law limits the cause of action of misappropriation to famous individuals. *See e.g. Kislak; Bisbee.*

Even if New Jersey law were to make such a distinction, plaintiff Tellado could be considered a public figure for the limited purpose of the photograph at issue. Prosser states:

A public figure has been defined as a person who, by his accomplishments, fame, or mode of living, or by adopting a profession or calling which gives the public a legitimate interest in his doings, his affairs, and his character, has become a 'public personage.' He is, in other words, a celebrity. Obviously to be included in this category are those who have achieved some degree of reputation by appearing before the public, as in the case of an actor, a professional baseball player, a pugilist, or any other entertainer. The list is, however, broader than this. It includes ... even ordinary soldiers.... It includes, in short, anyone who has arrived at a position where public attention is focused upon him as a person.

Prosser and Keeton on Torts at 860 (footnotes omitted). I do not think there is any dispute that plaintiff Tellado would fall into this category. Although public attention was not focused on him by name, it certainly was focused on him as a representative participant in an historical event of great social significance. While the State's highest court has not ruled on this issue, the law of New Jersey consistent with many other jurisdictions is that a misappropriation claim for a public event will stand only if the plaintiff's likeness is used for predominantly commercial purposes. As stated in *Bisbee:*

... mere publicity is not actionable; it must be shown that defendant acted with a commercial purpose or otherwise sought some benefit from revealing information about plaintiffs. *Bisbee,* 186 N.J.Super. at 343, 452 A.2d 689.

■ Thus, under New Jersey common law, defendant would be liable for the tort of misappropriation of likeness only if defendant's use of plaintiff's likeness was for a predominantly commercial purpose, i.e., if defendant was seeking to capitalize on de-

fendant's likeness for purposes other than the dissemination of news or information. A profit motive alone does not suffice as many nontortious uses of someone's likeness result in profits for their promoters. The use must be mainly for purposes of trade, without a redeeming public interest, news, or historical value.

Plaintiff contends that whether or not defendants' use is "commercial" under New Jersey law is a question of fact for the jury. Defendant maintains that this court should decide the question as a matter of law.

The characterization of the nature of an alleged tortious publication or a defense to such a claim is often treated as a matter of law for the court. *See, e.g. Cibenko v. Worth Publishers, Inc.,* 510 F.Supp. 761 (D.N.J.1981) (granting defendant's motion to dismiss plaintiff's libel and invasion of privacy claims because photograph at issue not highly offensive to a reasonable person as a matter of law); *Medico v. Time, Inc.,* 643 F.2d 134 (3d Cir.1981) (granting summary judgment on the basis of the fair report privilege); *Bisbee, supra* (granting summary judgment on misappropriation of likeness claim on basis that publication had news and historical value).

■ If I were to decide the question, I would probably find as a matter of law that defendant's first use and all subsequent uses of plaintiff's likeness were predominately commercial. The parties have, however, not adequately briefed this specific issue and I find that there is no need to reach the issue as plaintiff has not cross-moved for summary judgment. As this case is presently before me on defendant's motion for summary judgment, I must make all reasonable inferences in favor of plaintiff. Whether as a matter of law or a matter of fact, the only reasonable characterization of the publisher's letter inserted in the first volume is that it was a commercial advertisement. All subsequent uses of the photograph were also undeniably commercial advertisements. There is no dispute that the picture was *never* used in any book in the series.

As stated earlier, the publisher's letter was enclosed in the front of the first volume of the series.

The text and message of the letter is simply not an attempt to convey historical facts or political opinion, or even an attempt to entertain the reader. The letter's goal is to get the reader to open the book itself and to want to order future volumes.

The books are sent to the customer on a "10 days' free examination" basis. The customer has ten days in which to examine each volume; if he or she chooses to keep the volume and pay for it, subsequent volumes are then sent automatically. Thus, although the customer reading the publisher's letter had already ordered the book and had it in his or her possession, the book could have been returned without penalty. The letter's purpose was to induce the buyer to keep the first volume and to stimulate interest in remaining volumes.

Defendant contends that the flyer was an editorial distillation of what was inside the books, but my review reflects little editorializing and a lot of marketing. The letter starts out:

> On behalf of Boston Publishing Company, let me welcome you to Volume I of "The Vietnam Experience." I hope that you, as one of the first to read *Setting the Stage,* receive as much enjoyment from reading it as we had preparing it for you.

The letter then briefly summarizes the way Vietnam affected many Americans and describes the political and historical sequence that the editor believes has led to "a new perspective" where "Americans are once again asking what happened in Vietnam and why—what were we trying to accomplish there and who was right."

The letter then continues by explaining that the publishers "wanted to tell not only what happened, but also illuminate the experience of the war for those who fought it and opposed it, and those who directed it in the field and from distant capitals." The text describes subsequently what Volume I covers. Under the sub-title "The foreign

legion, Ho Chi Minh, and JFK" it then summarizes the contents of Volume II. The remainder of the letter lists highlights to be found in future volumes. Finally, the letter concludes:

I could go on and on with this list of fascinating chapters in "The Vietnam Experience." Each volume will be handsomely illustrated and, wherever possible, we will tell the story of the Vietnam War in the words of those who were there.

For now, *Setting the Stage* is designed to give you the knowledge so necessary to understanding the events of what we call the Vietnam War. Again, welcome to "The Vietnam Experience." We hope you find *Setting the Stage*—and the entire series—a challenging, fascinating reading experience.

At the top of each page of the four page letter, various photographs with captions are included. The photograph in which Mr. Tellado appears is on the top half of the last page of the letter.

There is no dispute that the remaining uses of the photograph were commercial or solely for trade purposes. Defendant does not even contend that they are protected uses, but only that they are "incidental" uses. Because I find that the initial use of the photograph is commercial, there is no need to reach defendant's argument that any remaining uses were incidental.

■ I find that under New Jersey law, defendant's use of plaintiff's likeness would not be privileged as a matter of law and plaintiff would be able to proceed to trial with his claim. Although the common law of New Jersey gives plaintiff a cause of action, defendant also contends that its use of the photograph is privileged under the First Amendment of the United States Constitution because the photograph was taken in a public place during a war and, although it was not used in the book, it could have been so used. I, therefore, must also evaluate defendant's use in light of the First Amendment.

A court in this district has also considered a misappropriation of likeness claim under New Jersey law and has also read New Jersey law as barring only those uses of an individual's likeness that are predominantly for commercial purposes. In *Estate of Presley v. Russen*, 513 F.Supp. 1339 (D.N.J.1981), Judge Brotman commented on First Amendment considerations present in such cases, stating as follows:

The purpose of the portrayal in question must be examined to determine if it predominantly serves a social function valued by the protection of free speech. If the portrayal mainly serves the purpose of contributing information, which is not false or defamatory, to the public debate of political or social issues or of providing the free expression of creative talents which contributes to society's cultural enrichment, then the portrayal generally will be immune from liability. If, however, the portrayal functions primarily as a means of commercial exploitation, then such immunity will not be granted.

*Id.* at 1356, citing to Flecher and Rubin, *Privacy, Publicity, and the Portrayal of Real People by the Media*, 88 Yale L.J. 1577 (1979).

My analysis of the relevant Supreme Court caselaw leads me to conclude that this is an accurate summary of the law. Two lines of cases provide guidance as to how the United States Supreme Court would view the New Jersey law of misappropriation of likeness.

The court has addressed various aspects of the tort commonly referred to as an invasion of the right of privacy, although it has not ruled directly on a misappropriation of likeness claim by a non-famous plaintiff. Because this tort takes so many forms and is evaluated differently depending on the nature of the alleged invasion, the type of information communicated, and the veracity of the publication, the Supreme Court rulings provide only general guidance in the form of *dicta*. In *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), plaintiff Hill sued Life Magazine for falsely portraying in a review of a play an episode in which Hill and his family were held hostage in their home by some es-

caped convicts. Hill's suit was based on New York Civil Rights Law § 50 which states:

A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.

Because the play was a matter of public interest and because the jury was not instructed that the untrue statements had to have been recklessly made, the Court reversed the jury verdict for the plaintiff. The instant case differs significantly from *Hill* in that commercial speech is at issue and there are no allegations of a false portrayal of plaintiff. In spite of this, *Hill* gives some indication that the commercial use requiring compensation under New Jersey law would not be constitutionally protected in the same way as the Life magazine review was. The Court in *Hill*, while not ruling on the issue, indicated that the New York statute, if construed, "to proscribe only ... the appropriation and use in advertising or to promote the sale of goods, of another's name, portrait or picture without his consent" may be constitutional. *Id.* at 381, 87 S.Ct. at 538. This construction of the New York statute is essentially the same as the present New Jersey common law of commercial misappropriation of likeness.

Eight years later, the court commented on another aspect of the violation of privacy tort. In *Cox Broadcasting v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Court ruled that the First Amendment precludes a cause of action for invasion of privacy brought about by publication of the name of a deceased rape victim. The Court rejected Cohn's claim because the commission of a crime and judicial proceedings are events of legitimate concern to the public and because the information appeared on the public record already. The Court commented, however, on the Georgia right to privacy law as follows:

Georgia stoutly defends both § 26–9901 and the State's common-law privacy action challenged here. Its claims are not without force, for powerful arguments can be made, and have been made, that however it may be ultimately defined, there is a zone of privacy surrounding every individual, a zone within which the State may protect him from intrusion by the press, with all its attendant publicity. *Id.* at 487, 95 S.Ct. at 1042.

The Court then distinguished the nature of the privacy claim at issue there from other common law privacy torts, stating:

These are impressive credentials for a right of privacy, but we should recognize that we do not have at issue here an action for the invasion of privacy involving the appropriation of one's name or photograph, a physical or other tangible intrusion into a private area, or a publication of otherwise private information that is also false although perhaps not defamatory.

*Id.* at 489, 95 S.Ct. at 1043. Thus, the Court explicitly left open the question presented here—whether defendant may be held liable for a commercial misappropriation of plaintiff's photograph, which was taken in a public place.

Another line of cases establishes that defendants use is not devoid of First Amendment protection simply because it is commercial speech.

In *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) the court struck down a Virginia statute prohibiting the advertising of abortion clinics. The Court reaffirmed its holding that speech is not stripped of its First Amendment protection merely because it appears in commercial form. *Id.* at 818, 95 S.Ct. at 2230, citing *Pittsburgh Press Co. v. Human Rel. Comm'n,* 413 U.S. 376, 384, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973). The Court stated:

The fact that the particular advertisement in appellant's newspaper had commercial aspects or reflected the advertiser's commercial interests did not negate all First Amendment guarantees. The

State was not free of constitutional restraint merely because the advertisement involved sales or 'solicitations,' ... or because appellant was paid for printing it, ... or because appellant's motive or the motive of the advertiser may have involved financial gain.... The existence of 'commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment.'

*Id.* at 818, 95 S.Ct. at 2230 (citations omitted).

In *Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S.Ct. at 1817, 48 L.Ed.2d 346 (1976), the Court emphasized that even commercial advertising completely and totally devoid of any editorializing on any subject, cultural, philosophical or political, still comes within the protection of the First Amendment. At issue in that case was the pharmacist's wish to communicate the idea that "I will sell you the X prescription at the Y price." *Id.* at 748, 96 S.Ct. at 1817.

Although defendant Time Life's use of plaintiff's photograph in its advertisement amounts to more than "I will sell you X at Y price" even if, in making all reasonable inferences in favor of plaintiff, I were to reduce it to such a level, it would still enjoy a certain degree of First Amendment protection. The question is then what degree and kind of protection does it enjoy.

After finding certain forms of commercial speech protected, the Court has emphasized that reasonable regulation of commercial advertising is permissible. In *Bigelow,* the court distinguished an earlier case, *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), which had sustained an ordinance banning the distribution of handbill advertising on public streets, stressing that the regulation there was reasonable and did not ban commercial advertising all together. *Id.,* 421 U.S. at 819, 95 S.Ct. at 2231. The *Bigelow* court also stated at page 826, 95 S.Ct. at 2234 that "advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest."

Finally, in *Virginia Pharmacy,* the court was careful to note that:

In concluding that commercial speech, like other varieties, is protected, we of course do not hold that it can never be regulated in any way. Some forms of commercial speech regulation are surely permissible.

*Id.,* 425 U.S. at 770, 96 S.Ct. at 1829.

The state regulation of commercial speech that I would be upholding in allowing plaintiff's common law claim to go forward is simply the right of an individual to be compensated for the commercial use of his or her likeness. The defendant's right of free expression is abridged only insofar as it is required to share some of its profits with the individual whose likeness is helping to stimulate those profits.

One Supreme Court case concerning commercial misappropriation indicates that such state regulation would be considered reasonable. In *Zacchini v. Scripps-Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the Court found that a television broadcasting station could be held liable for broadcasting a "human cannonball's" entire 15 second act on its evening news show. The Court found that although the act was open to the public and was newsworthy, the broadcasters misappropriated a valuable property right of plaintiff's. The Court's reasoning was based primarily on the fact that:

[t]he broadcast of a film of petitioner's entire act poses a substantial threat to the economic value of that performance.... [T]his act is the product of petitioner's own talents and energy, the end result of much time, effort and expense.

*Id.* at 575, 97 S.Ct. at 2857.

The Court's discussion centered primarily on the "right of publicity" aspect of the tort claim because the basis for Zacchini's claim was the economic value that had been taken from him, but the broad language of the Court's opinion applies to Tellado's claim in certain respects.

The Court quoted an article on privacy law as follows:

> The rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay. Kalven, Privacy in Tort Law—Were Warren and Brandeis Wrong?, 31 Law & Contemp.Prob. 326, 331 (1966).

*Id.* at 576, 97 S.Ct. at 2857. The Court also emphasized, "[P]etitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it." *Id.* at 578, 97 S.Ct. at 2859.

*Zacchini* demonstrates, therefore, that in certain situations, even when the publication at issue is clearly "news" and not for commercial purposes, that the publisher can be required to compensate the individual whose likeness was used. The right to compensation would seem even more compelling where the use is solely commercial.

I conclude, therefore, that plaintiff's New Jersey common law claim of misappropriation of likeness does not infringe on any First Amendment rights of defendant.

I emphasize that defendant did not use plaintiff's photograph in any part of the books themselves. Had plaintiff's picture been used to depict the history of the Vietnam war, defendant's use clearly would have been protected by the First Amendment, regardless of what type of profit defendant expected to make with its book series. However traumatic the memories of the War are for plaintiff, defendant's right to contribute to the public debate on Vietnam would have prevailed. It is important to remember here that defendant used plaintiff's photograph solely to hype its product. Plaintiff should be permitted to seek compensation for this use.

Defendant's motion for summary judgment is granted as to Count Two of plaintiff's complaint and denied as to Count One.