687 A.2d 1009

GEORGE WILSON, PLAINTIFF–APPELLANT, v. BOB GRANT,
DON BOULOUKOS, WABC RADIO, CAPITAL CITIES/ABC,
INC., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 2, 1996—Decided December 12, 1996.

130

Before Judges SHEBELL, BAIME and BRAITHWAITE.

Appellant *George Wilson* argued pro se.

*Robert P. LoBue (Patterson, Belknap, Webb & Tyler LLP)* of the New York Bar, admitted pro hac vice, argued the cause for respondents (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* and *Mr. LoBue,* attorneys; *Mr. LoBue* and *Kim Sweet,* on the brief).

The opinion of the court was delivered by

BRAITHWAITE, J.A.D.

Plaintiff appeals from an order granting summary judgment dismissing his complaint against defendants. Plaintiff's complaint alleged libel, intentional infliction of emotional distress, and invasion of privacy. Although plaintiff's complaint contained fifteen counts, he appeals only from the dismissal of two counts, one alleging libel, and the other alleging public disclosure of private facts. Seven counts of the complaint were dismissed because the statute of limitations had expired. The remaining counts were dismissed because the trial court found that the words that were the basis of the claims were spoken in such a context as not to be defamatory.

On this appeal, plaintiff contends:

I. MOTION JUDGE ERRED IN DISMISSING PRIMA FACIE CASE; THEREBY DEPRIVING PLAINTIFF HIS CONSTITUTIONAL RIGHT OF REDRESS.

 A. MOTION JUDGE WAS WOEFULLY NEGLIGENT BY FAILURE TO ADDRESS INVASION OF PRIVACY, TREATING IT AS DE FACTO DEFAMATION.

 B. MOTION JUDGE MISAPPLIED "THE *BRILL* STANDARD" TO DISMISS LIBELOUS PER SE VERBATIM IMPUTATION OF "WIFE–BEATING."

II. PLAINTIFF HAS ESTABLISHED REASONABLE CAUSE OF ACTION FOR INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS.

 A. PLAINTIFF'S RECORD AND HISTORY OF PSYCHIATRIC HOSPITALIZATION IS SEALED BY STATUTE.

 1. PLAINTIFF'S "PLAIN ERROR" IGNORANCE OF *N.J.S.A.* 30:4–24.3 MAY HAVE CONTRIBUTED TO THE MANIFEST MISCARRIAGE OF JUSTICE.

 B. NECESSARY NEXUS DOES NOT EXIST BETWEEN DISCLOSURE AND PLAINTIFF'S INVOLVEMENT IN PUBLIC CONTROVERSY.

 C. DEFENDANT'S DISCLOSURE WAS INTENTIONAL AND MALICIOUS.

III. PLAINTIFF HAS ESTABLISHED REASONABLE CAUSE OF ACTION FOR LIBEL PER SE.

 A. PLAINTIFF WAS LIBELED WITH ACTUAL MALICE.

 B. CONTEXT FAVORS PLAINTIFF

 1. IMMEDIATE CONTEXT OF THE BROADCAST.

 2. BROADER SOCIAL CONTEXT OF TALK RADIO.

We reject plaintiff's contentions and affirm.

In January 1992, plaintiff, who is "engaged in the business of monitoring radio broadcasts," began monitoring and taping defendant Bob Grant's talk-radio program broadcast by defendant WABC Radio, Inc.[1] each weekday afternoon. Defendant Don Bouloukos was the general manager of WABC during the time of the incidents set forth in plaintiff's complaint.

Plaintiff began complaining about Grant's broadcasts in 1988, asserting that Grant, through his program, contributed to a climate of racism. His original complaints were lodged by calling Grant to confront him on the air about the views that he expressed during his broadcasts. The telephone calls were heated and confrontational.

In 1992, plaintiff wrote several letters to the president of WABC complaining about Grant's program. In one letter dated April 4, 1992, plaintiff requested that WABC "do the right thing by replacing Bob Grant." In the same letter, plaintiff boasted that one of his tapes "influenced the Jewish National Fund to replace Grant with Leon Charney as Master of Ceremonies for their 90th annual gala event this past January." In the letter plaintiff also said that he believed that "Bob Grant is evil."

---

[1] This defendant was incorrectly named as WABC Radio and Capital Cities/ABC, Inc.

In a letter to an executive of WABC dated October 13, 1992, plaintiff stated, "I will not rest until ... Grant [is] no longer heard on commercial radio in this area." In the same letter, plaintiff went on to say that the First Amendment "guarantees our right to continually speak out, to peacefully assemble, and to boycott sponsors regarding this problem." In addition, the letter spoke of plaintiff's efforts in removing two other "hatemongers" from other radio stations in 1991 and 1992.

In a letter dated November 24, 1992, plaintiff alleged that "WABC Radio engages in overt racism against people of African ancestry every single day for several hours." The same letter stated that "racial slurs are uttered by host Bob Grant ... on a regular basis at WABC." Because plaintiff perceived that WABC had taken no action to correct the problem, plaintiff further stated: "I am now commencing a public campaign against Capital Cities/ABC and its executives, who have willfully neglected to address this situation. I am now going public, in broadcast and in print, to name those responsible for allowing [Bob Grant] to divide our society along racial lines." Plaintiff concluded this letter by stating, "I hereby charge you with racism."

In furtherance of his mission to remove Grant from the radio, plaintiff wrote newspapers articles and letters to various publications complaining about Grant's radio broadcast. In these articles and letters, plaintiff accused Grant of uttering "racial slurs" during his broadcast. Further, he described Grant's show as a perpetual "hatefest" against Black people laced with racial slurs and occasional "invocations to violence." Moreover, he continued to tape Grant's show and provide copies of the tapes to other people and organizations.

In one instance, plaintiff provided a tape of one of Grant's shows to school officials in Neptune. On the tape, David C. Clark, a Neptune teacher who had called Grant's show, complained about Black History month and the curriculum that he was required to teach during that period. After school system officials heard the tape, Clark was suspended with pay. Shortly after Clark's sus-

pension, plaintiff sent a letter to *The Asbury Park Press,* contending that Grant was responsible for Clark's suspension. *The Asbury Park Press* published plaintiff's letter on March 9, 1992.

Moreover, plaintiff sent tapes of defendant's show to Washington Media Associates. Washington Media Associates informed plaintiff that the "material" that he provided would be useful to demonstrate "how talk radio has helped to poison the waters relative to the Clinton presidency."

During plaintiff's campaign to remove Grant from the radio, Grant discussed plaintiff on his radio broadcast. He referred to plaintiff as a "stalker" because of his activities and called plaintiff "some little weasel," "a vicious swine," and "a sick cookie," among other things.

On June 10, 1993, an article about plaintiff was published in *The Daily Challenge.* The title of the article was "Keeping The Tapes On Hate Radio 'Hate–Gate.'" The article described plaintiff's activities in monitoring "hate radio programs" and referred to plaintiff as a "man on a mission." Further, the article quoted unnamed persons who labeled plaintiff "'possessed by the ancestors' ... 'crazy' ... or more 'obsessed than possessed.'"

In early October 1994, plaintiff provided a tape of one of Grant's radio broadcasts to the Reverend Reginald T. Jackson, who furnished copies to the Lautenberg and Haytaian campaigns for the United States Senate. The tape became an issue during a debate between the candidates.

On October 26, 1994, the day after the debate, Grant said the following on the air:

[W]hat in heaven's name possessed you [Lautenberg] to come up with that—with that ridiculous tape that has been compiled by a virtual stalker.... [Y]ou can stalk somebody physically, or you could stalk someone psychologically, or you could stalk someone the way George Wilson has been stalking me. Now, he's a guy—we haven't really wanted to mention his name in the past, we didn't want to give him the publicity because that's what he craves. But he's a guy who's been compiling tapes on me —I'm his whole life. I am told that because his wife supports him he doesn't have to work for a living and therefore he has all the time in the world to do nothing but tape record "The Bob Grant show," "Jay Diamond Show," any other

show, and he has this obsession.... I also hear that this individual that I've talked about has been in Marlboro State Hospital.[2] That's in Marlboro, New Jersey. Now, that's what I've been told. Now, this guy can't remain anonymous and do all these things.

On February 13, 1995, Neptune High School teacher David C. Clark died of cancer. On that same day, in response to a caller's comments about Clark's death, Grant said the following:

Well, as you know, or maybe you don't know, I signed a deal with Simon & Schuster. At long last I'm really in the process of writing a book. And, naturally, when I talked to my editor over there at the publishing house they told me some of the things that they thought that readers would be interested in. One was unusual phone calls that I've received. And by unusual they mean the consequences of a call, perhaps, the ramifications of a call, and certainly the David Clark story will be told completely in the book. I haven't been able to tell the entire story on the air for a couple of reasons. But the entire story will be told, and even the person—the person who really was responsible for David C. Clark being exposed. You know, when a person calls "The Bob Grant Show," like you, Ed of Belmar, that's all we know. You're Ed of Belmar. However—however, if there's someone who knows who you are and they don't like what you say, and they are a sick, no good, pot smoking, wife beating skunk—and this guy knows I'm talking about him, he's getting nervous.

ED: Is that Westfield media monitor?

BOB GRANT: Yes, from Westfield, right.

## I

██ We first address plaintiff's assertion that the trial judge erred in dismissing his libel claim because Grant's statement "sick, no good, pot smoking, wife beating skunk" is actionable. Although in the statement Grant does not specifically refer to plaintiff by name in response to the caller's question, Grant sufficiently identifies plaintiff as the person to whom the comments were directed. There had been many prior references to plaintiff as the "Westfield media monitor" during plaintiff's and Grant's "public feud" over the years.

██ The resolution of this issue depends on "whether the language used is reasonably susceptible of a defamatory meaning."

---

2 This reference is to Marlboro Psychiatric Hospital, which is a New Jersey State psychiatric facility located in Marlboro.

*Kotlikoff v. The Community News,* 89 *N.J.* 62, 67, 444 *A.*2d 1086
(1982). "Whether the meaning of a statement is susceptible of a
defamatory meaning is a question of law for the court. In
determining whether the statements are defamatory, we must
consider the content, verifiability, and context of the challenged
statements." *Ward v. Zelikovsky,* 136 *N.J.* 516, 529, 643 *A.*2d 972
(1994) (citations omitted). We note, however, that plaintiff only
challenges the "wife-beating" portion of the comment. He asserts
no claim based on the remainder of the statement.

█ "Courts begin their review to determine whether a state-
ment is susceptible of a defamatory meaning by looking 'to the fair
and natural meaning which will be given it by reasonable persons
of ordinary intelligence'" *Ibid.* (citations omitted). "The court
must consider all the words used not merely a particular phrase or
sentence." *Cole v. Westinghouse Broadcasting Co., Inc.,* 386
*Mass.* 303, 435 *N.E.*2d 1021, 1025, *cert. denied,* 459 *U.S.* 1037, 103
*S.Ct.* 449, 74 *L.Ed.*2d 603 (1982). Therefore, our focus must be on
the defendant's entire statement, not just "wife-beating."

Here, Grant's full remark was "sick, no good, pot smoking, wife
beating skunk." We acknowledge that the words "wife-beating,"
taken alone, could be defamatory, especially in light of our soci-
ety's heightened awareness of domestic violence. *See, e.g.,*
*N.J.S.A.* 2C:25–18. When "wife-beating" is considered in the
context with the remaining words, however, we are satisfied that
the language is mere name-calling or verbal abuse. "The common
law has always differentiated sharply between genuinely defama-
tory communications as opposed to obscenities, vulgarities, insults,
epithets, name calling, and other verbal abuse." Rodney A.
Smolla, *Law of Defamation* § 4.03 at 4–12 (1995).

As to verifiability, we agree that whether plaintiff is a "wife-
beater" is capable of being verified. Nonetheless, Grant used
"wife-beating" as a descriptive adjective for the noun "skunk."
We think it inappropriate, under these circumstances, to separate
"wife-beating" from the remaining remarks by Grant. Grant
engaged in "non-defamatory name calling." *Ward, supra,* 136

*N.J.* at 530, 643 *A.*2d 972. "There are some statements that are in form statements of opinion, or *even of fact,* which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse." *Restatement (Second) of Torts,* § 566 Comment e. (emphasis added). We are satisfied that this is the case here, despite the ability to verify whether plaintiff is a "wife-beater."

■ We next consider the context. We examine "the statement in its totality in the context in which it was uttered or published." *Cole, supra,* 435 *N.E.*2d at 1025. "[T]he context to be considered is both narrowly linguistic and broadly social." *Ollman v. Evans,* 750 *F.*2d 970, 982 (D.C.Cir.1984)(en banc), *cert. denied,* 471 *U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985). "The listener's reasonable interpretation, which will be based in part on the context in which the statement appears, is the proper measure for whether the statement is actionable." *Ward, supra,* 136 *N.J.* at 532, 643 *A.*2d 972.

Here, Grant's remarks were made in the context of a long time "war of words" between plaintiff and Grant. Plaintiff was a radio monitor who commenced a public campaign to vanquish Grant from the airwaves because plaintiff perceived that Grant was dividing "our society along racial lines." Plaintiff taped Grant's show and provided those tapes to others and wrote letters to Grant's employer and to the media complaining about Grant and his talk show. Furthermore, a published article about plaintiff dated June 10, 1993, stated that plaintiff had "monitored 'hate radio programs'... for over five years." The article discussed plaintiff's claims that "he has gotten people fired for 'broadcasting hate'" and that "he is currently out to nail Bob Grant." Plaintiff's efforts to get rid of Grant began in 1988. Grant, in response, had referred to plaintiff as a "stalker" and other unflattering terms.

■ In addition to the above circumstances, when considering context we also look at the "medium by which the statement is disseminated and the audience to which it is published." *Cole, supra,* 435 *N.E.*2d at 1025. Grant made his remarks during the

broadcast of his controversial talk-radio show. Grant's listeners knew that he would make provocative and caustic remarks during his broadcast.

> Indeed "[t]he ordinary reasonable recipient of a communication naturally discounts to some degree statements made in the heat of vitriolic battle, because the recipient understands and anticipates the human tendency to exaggerate positions during the passions and prejudices of the moment."
>
> [*Ward, supra,* 136 *N.J.* at 532–33, 643 *A.*2d 972 (quoting Smolla, *supra,* § 6.08[4][b][ii], at 6–35)(alteration in original).]

Further, Grant's listeners were aware of his verbal feud with plaintiff. They knew about plaintiff's monitoring and his efforts to remove Grant from the airways. Moreover, the listeners were aware of plaintiff's involvement in the David C. Clark incident involving the Neptune School District.

Grant made his remarks during a conversation with a caller about the death of David Clark, who died earlier on the same date. The caller and Grant were discussing the tragedy of Clark's death and a book that Grant intended to write, which would include "the David Clark story," when Grant, who perceived that plaintiff was responsible for Clark's suspension, made his comment. In this context, we conclude that any listener "must have perceived that the word[s] [were] no more than rhetorical hyperbole, a vigorous epithet used by" Grant who perceived that plaintiff was responsible for the misfortune visited upon David Clark. *Greenbelt Coop. Publ'g. Ass'n. v. Bresler,* 398 *U.S.* 6, 14, 90 *S.Ct.* 1537, 1542, 26 *L.Ed.*2d 6, 15 (1970). *Cf. National Ass'n of Gov't Employees v. Central Broadcasting Corp.,* 379 *Mass.* 220, 396 *N.E.*2d 996 (1979), *cert. denied,* 446 *U.S.* 935, 100 *S.Ct.* 2152, 64 *L.Ed.*2d 788 (1980)(holding that a statement accusing a union of "communism" was opinion, and, therefore, not actionable because the audience heard the charge on a radio call-in talk show during a public debate over a labor contract that threatened to add to the tax rate).

We also find it relevant that plaintiff voluntarily injected himself into a public controversy. Plaintiff, as a result of his activities regarding Grant, became a limited public figure. *See*

*Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 351, 94 *S.Ct.* 2997, 3013, 41 *L.Ed.*2d 789, 811 (1974).

> Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments. Perhaps it would be better if disputation were conducted in measured phrases and calibrated assessments, and with strict avoidance of the ad hominem; better, that is, if the opinion and editorial pages of the public press were modeled on The Federalist Papers. But that is not the world in which we live, ever have lived, or are ever likely to know, and the law of the first amendment must not try to make public dispute safe and comfortable for all the participants. That would only stifle the debate.
>
> [*Ollman, supra,* 750 *F.*2d at 993 (Bork, J. concurring).]

The motion judge properly concluded that the statement was not actionable and appropriately applied the criteria set forth in *Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 666 *A.*2d 146 (1995).

## II

■ We next address plaintiff's argument that the motion judge erred in granting summary judgment on plaintiff's claim of unreasonable publication of private facts. The motion judge concluded that this count was so intertwined with the dismissed defamation count that it could not stand on its own. He stated: "I do not find there is that separateness there that in this context would allow it to be recognized." Although we agree that summary judgment should have been granted, we do so for different reasons. "[A]n order or judgment will be affirmed on appeal if it is correct even though the judge gave the wrong reasons for it." *Ellison v. Evergreen Cemetery,* 266 *N.J.Super.* 74, 78, 628 *A.*2d 793 (App. Div.1993).

■ Our Supreme Court has defined the tort of unreasonable publication of private facts as follows:

> The invasion of privacy by unreasonable publication of private facts occurs when it is shown that 'the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized.'
>
> [*Romaine v. Kallinger,* 109 *N.J.* 282, 297, 537 *A.*2d 284 (1988)(quoting *Bisbee v. John C. Conover Agency,* 186 *N.J.Super.* 335, 340, 452 *A.*2d 689 (App.Div.1982)).]

Here, plaintiff complains that defendant revealed on his radio program that plaintiff, at one point, had been a patient at Marlboro Psychiatric Hospital.

We are satisfied that plaintiff satisfied the first two elements of the tort. Clearly, the matter of his hospitalization at Marlboro Psychiatric Hospital was private. Second, the dissemination of this information would be offensive to a reasonable person. We conclude, however, that the public had a legitimate interest in being apprised of these facts.

> The "newsworthiness" defense in privacy-invasion tort actions is available to bar recovery where the subject matter of the publication is one in which the public has a legitimate interest. A publication is commonly understood to be "newsworthy" when it contains an " 'indefinable quality of information' that arouses the public's interest and attention.' " In such cases it is for the court to determine whether a matter is of legitimate public interest.
>
> [*Romaine, supra,* 109 *N.J.* at 301, 537 *A.*2d 284 (citations omitted).]

 Because this tort allows "recovery for truthful disclosures ... [it] creates significant potential for conflict with the guarantees contained in the first amendment of the Constitution." *Id.* at 298, 537 *A.*2d 284. "Thus, '[a] factually accurate public disclosure is not tortious when connected with a newsworthy event even though offensive to ordinary sensibilities.' " Smolla, *supra,* § 10:04[2][b], at 10:33–10:34 (quoting *Neff v. Time, Inc.,* 406 *F.Supp.* 858, 861 (W.D.Pa.1976)(alteration in original)). "However, there must be an appropriate nexus between the plaintiff and the matter that is newsworthy or of legitimate public interest." *Romaine v. Kallinger, supra,* 109 *N.J.* at 302, 537 *A.*2d 284.

"The nexus requirement is construed very liberally, and is much broader than the definition for limited public figure status in defamation, which requires the plaintiff to voluntarily thrust himself into a public controversy." Smolla, *supra,* § 10.04[2][b][iii], at 10–35. Here, as previously stated, plaintiff voluntarily injected himself into a public controversy. "[T]he nexus requirement for the newsworthiness privilege in a private facts claim merely requires that a logical connection exist between the plaintiff and the newsworthy matter." *Ibid.*

We are satisfied that there is an appropriate nexus here. Plaintiff, by his actions, engaged in a public debate with Grant over the propriety of Grant's views, as expressed on his radio broadcast. In fact, plaintiff vowed to have Grant removed from the airways. Plaintiff stated that he would "exhaust every avenue to rid the airwaves of this societal menace." Plaintiff, whose actions were known to the public, was described in a published article as "crazy" and "more obsessed than possessed." Further, Grant referred to plaintiff as a "stalker," someone who had "stalked [him] for years." He also called plaintiff a "sick cookie to have this obsession with me." Under these circumstances, we conclude that a sufficient connection existed between plaintiff and the fact that he was hospitalized. *Cf. Gilbert v. Medical Economics Co.*, 665 *F.*2d 305 (10th Cir.1981) (holding that a sufficient nexus existed between disclosure of the name, photograph, psychiatric history, and marital problems of an anesthesiologist and a story of legitimate public interest concerning a medical malpractice claim involving the plaintiff).

 Moreover, in determining whether the newsworthiness privilege applies, we should balance "the relative newsworthiness of the publication against its level of offensiveness and intrusiveness into private matters." Smolla, *supra*, § 10.04[2][b][iv], at 10–35. The factors to be considered in the balance are: " '(1) the social value of the facts published; (2) the depth of the article's intrusion into ostensibly private affairs, and (3) the extent to which the party voluntarily acceded to a position of public notoriety.' " *Briscoe v. Reader's Digest Ass'n, Inc.*, 4 *Cal.*3d 529, 93 *Cal.Rptr.* 866, 875, 483 *P.*2d 34, 43 (1971)(quoting *Kapellas v. Kofman*, 1 *Cal.*3d 20, 81 *Cal.Rptr.* 360, 370, 459 *P.*2d 912, 922 (1969)). "[T]he assessment of public interest includes a determination whether the person 'voluntarily and knowingly engaged in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny.' " *Dairy Stores, Inc. v. Sentinel Publ'g. Co.*, 104 *N.J.* 125, 144, 516 *A.*2d 220 (1986)(quoting *Sisler v. Gannett Co.*,

*Inc.,* 104 *N.J.* 256, 274, 516 *A.*2d 1083 (1986)). The balance here tips in favor of the newsworthiness privilege.

Affirmed.