15 A.3d 300

G.D., PLAINTIFF–APPELLANT, v. BERNARD KENNY AND THE
HUDSON COUNTY DEMOCRATIC ORGANIZATION, INC.,
DEFENDANTS–RESPONDENTS.

G.D., PLAINTIFF–APPELLANT, v. CRAIG GUY; HAROLD E. DE-
MELLIER, JR., A/K/A BUD DEMELLIER; RAUL GARCIA,
A/K/A RUDY GARCIA; NICOLE HARRISON–GARCIA, DEFEN-
DANTS–RESPONDENTS, AND NEIGHBORHOOD RESEARCH
CORP., D/B/A MOUNTAINTOP MEDIA; RICHARD K. SHAF-
TAN, A/K/A RICK SHAFTAN; CAREYANN SHAFTAN, DEFEN-
DANTS–RESPONDENTS.

Argued September 14, 2010—Decided January 31, 2011.

278

*Charles R. Cohen* argued the cause for appellant (*Cohn Lifland Pearlman Herrmann & Knopf,* attorneys).

*William W. Northgrave* argued the cause for respondents Bernard Kenny, The Hudson County Democratic Organization, Inc., Craig Guy, Harold E. Demellier, Jr., a/k/a Bud Demellier, Raul Garcia, a/k/a Rudy Garcia, and Nicole Harrison–Garcia (*McManimon & Scotland,* attorneys; *Mr. Northgrave* and *Jaime R. Placek,* on the briefs).

*Grayson Barber* argued the cause for amicus curiae Electronic Privacy Information Center (*Ms. Barber,* attorney; *Ms. Barber* and *Marc Rotenberg,* a member of the Massachusetts bar, on the brief).

*Bruce S. Rosen* argued the cause for amicus curiae North Jersey Media Group Inc. (*McCusker, Anselmi, Rosen & Carvelli,* attorneys; *Jennifer A. Borg,* of counsel; *Mr. Rosen* and *Kathleen A. Hirce,* on the brief).

*Thomas J. Cafferty* argued the cause for amici curiae New Jersey Press Association, Advance Publications, Inc., The Associ-

ated Press, The American Civil Liberties Union of New Jersey, The American Society of Newspaper Editors, and The Association of Capitol Reporters and Editors (*Scarinci Hollenbeck*, attorneys; *Mr. Cafferty*, *Nomi I. Lowy* and *Lauren James–Weir*, on the brief).

*Michael Patrick Carroll* submitted a letter in lieu of brief on behalf of the respondents Neighborhood Research Corp., d/b/a Mountaintop Media, Richard K. Shaftan, a/k/a Rick Shaftan, and CareyAnn Shaftan.

Justice ALBIN delivered the opinion of the Court.

The primary issue in this case is whether criminal-conviction information, truthfully reported in campaign flyers, is civilly actionable when the conviction is the subject of an expungement order. The secondary issue is whether the "facts" contained in the flyers are sufficiently accurate to merit protection against claims for defamation and related privacy torts.

During a primary contest for State Senate, opponents of candidate Brian Stack issued campaign flyers criticizing him for previously hiring a person with a criminal conviction, plaintiff G.D. One campaign flyer stated that G.D. was "a DRUG DEALER who went to JAIL for FIVE YEARS for selling coke near a public school." G.D. filed a lawsuit alleging defamation, violation of privacy, and other related torts, and named as defendants the Hudson County Democratic Organization and certain individuals, as the purported authors and distributors of the flyers.

Defendants assert truth as a defense. G.D. had been convicted of second-degree possession with intent to distribute cocaine and sentenced to a five-year prison term. Thirteen years later, he successfully petitioned for the expungement of his criminal record. Defendants reason that G.D.'s conviction was a public fact maintained as a public record long before the expungement and that the publication of that fact during a political campaign was a legitimate exercise of their free-speech rights and did not violate G.D.'s reasonable expectation of privacy.

G.D. counters that the record of his conviction was expunged and, therefore, his conviction—as a matter of law—is deemed not to have occurred. G.D. submits that, after the expungement of his record, the pronouncement that he was convicted of a crime was simply false and the dissemination of the expunged information violated his privacy rights.

The trial court denied the parties' cross-motions for summary judgment. The Appellate Division reversed and dismissed G.D.'s causes of action, holding that the expungement of a public record—the record of a criminal conviction—does not, for purposes of defamation and the other related tort claims, render false a public fact.

The issue before us arises in the realm of political discourse, where speech is often harsh and caustic, but where the constitutional guarantee of free expression is given great latitude. Although our expungement statute relieves a prior offender of some civil disabilities, it does not extinguish the truth.

First, defendants in this case were entitled to assert truth as a defense to the defamation and other related tort actions, even though G.D.'s conviction was subject to an expungement order. Second, G.D. has failed to establish that the flyers were not substantially accurate. Last, G.D. had no reasonable expectation of privacy that information so long in the public domain before the entry of the expungement order would be erased from the public's mind or from papers already widely disseminated. We therefore affirm the Appellate Division's dismissal of G.D.'s claims on summary judgment.

## I.

### A.

In 1991, G.D., a resident of Union City, was charged in a three-count Hudson County indictment with possession of a controlled dangerous substance (cocaine), possession with intent to distribute

cocaine, and distribution of cocaine.[1] He pled guilty to second-degree possession with intent to distribute cocaine and, on January 8, 1993, was sentenced to a five-year (flat) state-prison term.[2] The remaining charges were dismissed. The Superior Court judge who imposed sentence noted on G.D.'s judgment of conviction that "[t]he quantity of the drugs was substantial."

From January 2000 to December 2001, G.D. worked as a part-time aide to then Hudson County Freeholder Brian Stack. He earned $6,000 per year in that position. That two-year period was the only time Stack ever employed G.D. Sometime afterward, G.D. worked at a day care center administered by Stack's estranged wife.[3]

On June 12, 2006, a Superior Court judge granted G.D.'s petition for an order expunging any record of his 1993 drug conviction as well as any record of his arrest and the charges. The expungement order directed that certain named law enforcement and judicial agencies not release information concerning the expunged records "for any reason except as authorized by law"; that those agencies respond to requests for information "that there is no record," "except where otherwise authorized by law"; and that the "arrest ... shall be deemed not to have occurred, and [that G.D.] may answer accordingly." The Department of Corrections continued to list G.D.'s conviction on its website as late as August 21, 2008.[4]

---

[1] The facts presented here are essentially undisputed and based on the record developed through the pleadings and certifications filed by the parties.

[2] The sentencing range for a second-degree crime is five to ten years. *N.J.S.A.* 2C:43–6(a)(2). A flat term indicates that the sentence is not subject to a mandatory period of parole disqualification. Eligibility for parole on a flat term is determined by statute and regulation, and ultimately by a decision of the Parole Board. *See, e.g., N.J.S.A.* 30:4–123.45 to –123.88; *N.J.A.C.* 10A:71–1.1 to –9.8.

[3] This assertion in defendant Richard Shaftan's certification and statement of undisputed facts was not challenged by G.D.

[4] The Department of Corrections is not one of the named agencies directed by the expungement order to expunge G.D.'s records. The expungement order was

In 2007, Stack, who then was both the Mayor of Union City and a State Assemblyman, sought the Democratic nomination for State Senate. Stack was opposed by the Hudson County Democratic Organization, Inc. (Democratic Organization), whose chief executive officer was Bernard Kenny and whose executive director was Craig Guy. The Democratic Organization backed another candidate. G.D. supported Stack's nomination but had no involvement in the Senate campaign.

The Democratic Organization hired a political consulting and advertising firm run by Richard and CareyAnn Shaftan—Neighborhood Research Corp., d/b/a Mountaintop Media (Mountaintop Media)—to work on the campaign opposing Stack's election.[5] During the course of his investigation, Mr. Shaftan learned of G.D.'s 1993 drug conviction, and at some point he obtained the judgment of conviction. Mr. Shaftan claims that he was "led to understand that the site of the crime was close ... to a public school." He never explained how he came to that understanding. He also claims that he had no knowledge of the expungement order during the election cycle.

Based on his research, Mr. Shaftan composed four campaign flyers attempting to discredit Stack in his bid for the State Senate nomination. The flyers were reviewed and approved by the Democratic Organization. Two of the flyers, printed in English and Spanish, disparaged Stack for his association with G.D. One flyer read as follows:

[Front]

IT'S THE COMPANY YOU KEEP and the sleazy crowd Brian Stack surrounds himself with says a lot about who Stack is.

COKE DEALERS AND EX-CONS.

---

prepared by G.D. In August 2008, counsel for the Hudson County Democratic Organization observed G.D.'s criminal-conviction data on the Department of Corrections' website. He then notified G.D.'s counsel the next day, and shortly thereafter the information was no longer available on the website.

[5] Richard Shaftan is the president and his wife, CareyAnn Shaftan, the vice president of Mountaintop Media.

THAT'S THE KIND OF "REFORM" BRIAN STACK IS ALL ABOUT.

[Back]

YOU READ ABOUT DRUG DEALER [H.M.], A STACK CRONY CURRENTLY "WORKING" AT THE COUNTY VOCATIONAL SCHOOL AFTER BEING DEPORTED FOR SELLING COCAINE NEAR A PUBLIC SCHOOL. NOW READ ABOUT STACK REFORMER # 2

[Next to photograph of G.D.:] Like [H.M.], [G.D.] is also a DRUG DEALER who went to JAIL for FIVE YEARS for selling coke near a public school. After getting out of jail, [G.D.] landed a job as a highly paid "aide" to Mayor Stack.

[Next to photograph of G.D.:] Today, [G.D.] is an aide at the controversial Union City Day Care Center—assisting the embattled Mayor's estranged wife.

DRUGS, GANGS, AND THUGS ARE NOT JUST A PROBLEM ON UNION CITY STREETS. THEY'RE A PROBLEM IN STACK'S CITY HALL TOO. AND NOW HE WANTS A PROMOTION? ? ?

The second flyer did not mention G.D.'s name but displayed his photograph. It read as follows:

[Front]

[Photographs of three men, including G.D.:]
TEAM STACK:
COKE DEALERS. GUN RUNNERS. EX CONS

THE MORE PEOPLE KNOW, THE MORE QUESTIONS THEY HAVE ABOUT BRIAN STACK.

[Back]

UNION CITY MAYOR BRIAN STACK'S CLOSEST POLITICAL OPERATIVES: GUN RUNNERS, COKE DEALERS, EX-CONS.

We all know the threat that drugs and illegal guns have in our communities. But not Brian Stack. He continues to surround himself with one shady character after another—not one but two convicted drug dealers and ex-cons, whom Stack got a high paying county job and a drugged out gunrunning lowlife who was his campaign manager.

BRIAN STACK PREACHES "REFORM" AND "GOOD GOVERNMENT" BUT HIS ADMINISTRATION IS MADE UP OF SLEAZY DRUG DEALERS AND OTHERS WHO SHOULD BE NOWHERE NEAR THE PUBLIC TREASURY.

The Democratic Organization printed and paid for 17,100 copies of the first flyer and 17,100 copies of the second flyer. On May 23 and 25, 2007, 8,184 copies of each flyer were mailed to members of the public.

## B.

On June 29, 2007, G.D. filed a civil complaint alleging that defendants Bernard Kenny and the Hudson County Democratic Organization committed the torts of libel and intentional infliction of emotional distress by disseminating two false and defamatory campaign flyers. G.D. claimed that the flyers damaged his reputation and caused him severe emotional harm, entitling him to compensatory and punitive damages. On May 14, 2008, G.D. filed a second complaint concerning the same two flyers, seeking compensatory and punitive damages and naming as defendants: Craig Guy; Howard Demellier, Jr.; Raul (Rudy) Garcia and his wife, Nicole Harrison–Garcia; Richard and CareyAnn Shaftan; and Mountaintop Media. This second complaint asserted claims for libel, casting G.D. in a false light, misappropriating his name and image, improper publication of private facts, invasion of privacy, intentional and negligent infliction of emotional distress, and civil conspiracy.

The trial court consolidated the two actions and, with the parties' consent, entered an order both sealing the pleadings and directing the parties to maintain the confidentiality of documents submitted to the court. Defendants moved for summary judgment, arguing that because the alleged defamatory statements were true, G.D. could not obtain relief on any of his claims. G.D. argued that the expunged conviction, as a matter of law, was a "non-event" and "deemed not to have occurred," and therefore he moved to bar defendants from asserting truth as a defense. He also sought partial summary judgment on the ground that the flyers were defamatory per se.

## C.

The trial court denied defendants' and G.D.'s motions, substantially because the discovery process was in its incipient stage—there were no depositions—and therefore the court could not "adequately address the actual events leading up to the alleged defamatory flyer[s]." The court made some preliminary observa-

tions based on the summary-judgment record before it: that G.D. was either a public figure or involved in a matter of public concern, that a court cannot "erase the memories of the general public who have knowledge of the criminal acts prior to the expungement," and that "a party does not have a constitutionally protected privacy interest in his criminal conviction even if expunged." But, in view of the uncompleted discovery process, the court came to no hard conclusions. Indeed, "given the proper set of circumstances, i.e., improper procurement of [G.D.'s] criminal history," the court noted that defendants may be liable for defamation. Moreover, the court reserved judgment whether defendants "would have been under an obligation not to publish" the events contained in the expunged records if they knew that G.D.'s criminal history had been expunged.[6]

### D.

The Appellate Division granted both G.D.'s and defendants' motions for leave to appeal and granted defendants' motion to stay discovery pending appeal. The appellate panel then entered summary judgment in favor of defendants, dismissing all of G.D.'s claims. *G.D. v. Kenny*, 411 *N.J.Super.* 176, 197, 984 *A.*2d 921 (App.Div.2009).

The panel determined that G.D.'s "successful expungement of [his] record does not make defendants' statements about that record 'false.'" *Id.* at 188, 984 *A.*2d 921. The panel reasoned that because the information in the flyers was true—and that truth could not be extinguished by the expungement order—G.D. could not satisfy an essential element of a defamation cause of action. *See id.* at 187–88, 984 *A.*2d 921. The panel recognized that our expungement statute, *N.J.S.A.* 2C:52–1 to –32, does not answer the question whether expunged records may be used in a defama-

---

[6] The trial court supplemented its oral decision rendered on November 17, 2008, with a written statement of reasons addressed to the Appellate Division. *See R.* 2:5–6(c).

tion action. *Id.* at 189, 984 *A.*2d 921. The panel found guidance from the courts of other jurisdictions that permitted truth as a defense to a defamation action when the claimed defamation consisted of the use of information in an expunged record. *Id.* at 189–92, 984 *A.*2d 921 (citing *Rzeznik v. Chief of Police of Southampton,* 374 *Mass.* 475, 373 *N.E.*2d 1128, 1130–31 (1978); *Bahr v. Statesman Journal Co.,* 51 *Or.App.* 177, 624 *P.*2d 664, 665–67, *review denied,* 291 *Or.* 118, 631 *P.*2d 341 (1981)). In holding that defendants could rely on the truth contained in G.D.'s expunged criminal-conviction record, the panel concluded that, like those courts, it saw "no value in permitting plaintiff to use the expungement statute as a sword, rather than the shield it was intended to be." *Id.* at 193, 984 *A.*2d 921 (citation omitted).

The panel also rejected G.D.'s argument that inaccuracies in the flyers stripped defendants of truth as a defense in a defamation action. *Ibid.* G.D. contended that one campaign flyer was inaccurate in stating that he sold drugs "near" a school and served five years in prison. *Ibid.* Nevertheless, the panel maintained that the statements were "fairly accurate." *Ibid.* Observing that G.D.'s drug offense was committed in Union City, a municipality with twelve public schools in an area one mile long and one-quarter mile wide, the panel did not "consider the [flyer's] reference to 'near a public school' to be misleading or unfair." *Ibid.* Nor did it consider the flyer's reference to G.D.'s sentence to be unfair, regardless of the time he actually served on his five-year prison term. *Ibid.*

The panel also found that truth—the substantial accuracy of the flyers—is a defense to the claims of intentional and negligent infliction of emotional distress, false light, invasion of privacy, and civil conspiracy. *Id.* at 195–97, 984 *A.*2d 921. With regard to those claims, the panel emphasized that the information about G.D.'s arrest was a matter of public record for sixteen years before entry of the expungement order and, even after the expungement, the conviction remained on the Department of Corrections' website. *Id.* at 195, 984 *A.*2d 921. Thus, the conviction was

not a private fact. *Id.* at 196, 984 *A.*2d 921. Finally, the panel declined to accept G.D.'s claim that the Shaftan defendants improperly misappropriated his name for a commercial purpose when the challenged speech in this case involved an election contest—a matter of public concern. *Id.* at 196–97, 984 *A.*2d 921.

We granted G.D.'s petition for certification. *G.D. v. Kenny*, 201 *N.J.* 498, 992 *A.*2d 793 (2010). We also granted the motions of North Jersey Media Group Inc., Electronic Privacy Information Center, New Jersey Press Association, Advance Publications, Inc., the Associated Press, the American Civil Liberties Union of New Jersey, the American Society of Newspaper Editors, and the Association of Capitol Reporters and Editors to serve as amici curiae.

## II.

G.D. contends that the Appellate Division erred in dismissing his defamation and privacy-tort claims. He makes four basic arguments. First, because his expunged conviction is deemed not to have occurred under the expungement statute, *N.J.S.A.* 2C:52–27, the publication of that conviction by defendants was a false and defamatory statement, and therefore defendants cannot invoke truth as a defense. Second, even if truth were a defense to the defamation claim, the information contained in one of the campaign flyers was not "fairly accurate" because he did not "sell" drugs, he did not go to jail for "five years," and he did not commit an offense involving a "public school." Third, concerning the privacy torts, defendants violated his reasonable expectation of privacy by publishing information about a highly personal matter that was expunged by law and therefore no longer contained in a public record. Last, the Appellate Division dismissed G.D.'s action prematurely, before virtually any discovery was taken, precluding inquiry into several areas, including how defendants came into possession of the expunged information.

Defendants counter that the expungement statute does not render a true statement false and that truth is a defense to a

defamation action and is protected under the First Amendment. Defendants maintain that the expungement statute does not obliterate the history or memory of a criminal conviction, or impinge on the right to speak freely, but only restricts use and access to the records of the conviction. Defendants also contend that the campaign flyers met the "fairly accurate" test in reporting G.D.'s possession-with-intent-to-distribute-drugs conviction. Defendants conclude that a truthful report of a matter within the public realm is neither defamatory nor violative of any privacy interest and that the Appellate Division, in the sensitive area touching on free speech, properly entered a timely order of summary judgment on G.D.'s non-actionable claims.

Amicus curiae North Jersey Media Group argues that, regardless of how expansively the expungement statute is read, both the First Amendment and defamation law protect the "accurate reporting of official records by the media" and prohibit the "imposition of civil or criminal sanctions for publication of true facts." Similarly, the New Jersey Press Association and its companion amici posit that truth is not only a defense to a defamation claim, but "a constitutionally protected value," and that the expungement statute cannot "erase the occurrence of events" or "transform an arrest or conviction into a private fact that would support an invasion of privacy claim." On the other hand, amicus Electronic Privacy Information Center urges this Court to hold that the "truth" about an expunged conviction should not defeat a claim for invasion of privacy and to recognize that the privacy torts are distinct from defamation. In the Center's view, an expunged criminal conviction is a private fact—regardless of its truth—and the publication of a private fact can be the basis of an invasion-of-privacy claim.

### III.

#### A.

The facts in this case must be viewed in their proper context: statements made in the heat of a contentious political campaign.

We also must recognize that political discourse, even in its meanest form, is at the very core of free-speech protections.

With that backdrop in mind, we must determine whether the expungement statute negates truth as a defense to a defamation action when a person publishes information about an expunged conviction. In other words, in circumstances such as here, can speech about an expunged conviction, assuming that the speech is substantially accurate, be punished through a defamation action? The answer to that question requires us to determine the reach of the expungement statute and whether the expansive interpretation of that statute sought by G.D. would run afoul of the free-speech guarantees of our federal and state constitutions. And we must decide whether dissemination of information that was in the public domain—but is now the subject of an expungement order—violates a reasonable expectation of privacy. That is, are formerly public facts (an arrest and conviction) transformed into private ones by the expungement statute, thereby subjecting defendants in this case to the tort of invasion of privacy?

We begin our analysis with a review of the law of defamation.

## B.

In a free society, "[t]he right to enjoy one's reputation free from unjustified smears and aspersions," *Senna v. Florimont*, 196 *N.J.* 469, 480, 958 *A.*2d 427 (2008), must be weighed against "[t]he significant societal benefit in robust and unrestrained debate on matters of public interest," *id.* at 491, 958 *A.*2d 427. The law of defamation attempts to strike "the proper balance between protecting reputation and protecting free speech." *Ward v. Zelikovsky*, 136 *N.J.* 516, 528, 643 *A.*2d 972 (1994).

To succeed in this defamation action, G.D. must prove three essential facts: (1) that defendants made a false and defamatory statement concerning G.D.; (2) that the statement was communicated to another person (and not privileged); and (3) that

defendants acted negligently or with actual malice.[7] *See DeAngelis v. Hill,* 180 *N.J.* 1, 13, 847 *A.*2d 1261 (2004). With respect to the defamation claim, the key question is whether the campaign flyers that referred to G.D. as a convicted drug dealer were true. There is no doubt that the flyers were defamatory.

A defamatory statement, generally, is one that subjects an individual to contempt or ridicule, *id.* at 13–14, 847 *A.*2d 1261 (citing *Lawrence v. Bauer Publ'g & Printing Ltd.,* 89 *N.J.* 451, 459, 446 *A.*2d 469 (1982)), one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him, *Ward, supra,* 136 *N.J.* at 529, 643 *A.*2d 972 (citing *Restatement (Second) of Torts* § 559 (1977)). To determine whether a statement is defamatory, a court looks "to the fair and natural meaning [to be given to the statement] by reasonable persons of ordinary intelligence." *Romaine v. Kallinger,* 109 *N.J.* 282, 290, 537 *A.*2d 284 (1988) (quotation omitted). A statement falsely attributing criminality to an individual is defamatory as a matter of law. *Id.* at 291, 537 *A.*2d 284 (citations omitted).

In a defamation action, truth is not only a common-law defense, but also "absolutely protected under the First Amendment." *Ward, supra,* 136 *N.J.* at 530, 643 *A.*2d 972 (citation omitted); *see also Senna, supra,* 196 *N.J.* at 496, 958 *A.*2d 427 (noting that under either actual-malice or negligence standard, truth is defense of constitutional magnitude in defamation case). Truth may be asserted as a defense even when a statement is not perfectly accurate.

---

[7] "[S]peech involving matters of public interest and concern" triggers the higher actual-malice standard because free speech on such matters "needs adequate breathing room in a democratic society." *Senna, supra,* 196 *N.J.* at 491, 958 *A.*2d 427. The actual-malice standard requires proof that the defamatory statement was published "with knowledge that it was false or with reckless disregard" of its truth or falsity. *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706 (1964).

The law of defamation overlooks minor inaccuracies, focusing instead on "substantial truth." *Masson v. New Yorker Magazine, Inc.*, 501 *U.S.* 496, 516, 111 *S.Ct.* 2419, 2432–33, 115 *L.Ed.*2d 447, 472 (1991); *see also Salzano v. N. Jersey Media Group Inc.*, 201 *N.J.* 500, 523, 993 *A.*2d 778 (2010) (discussing fair-report privilege and stating that "[a] fair report need not be a verbatim report; it is enough that the report be a rough-and-ready summary that is substantially correct" (citations and internal quotation marks omitted)). A court must consider a statement as a whole to determine the impression it will make on a reader. "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' " *Masson, supra,* 501 *U.S.* at 517, 111 *S.Ct.* at 2433, 115 *L.Ed.*2d at 472 (citations omitted); *see also Restatement (Second) of Torts, supra,* § 611 ("The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.").

The main issue is whether the flyers, one of which described G.D. as "a DRUG DEALER who went to JAIL for FIVE YEARS for selling coke near a public school," were false or substantially accurate. G.D. contends that, as a matter of law, the expungement of his conviction for possession with intent to distribute cocaine rendered the whole of that statement false.

We therefore next turn to New Jersey's expungement statute and then examine its interrelationship with defamation law.

## IV.

### A.

New Jersey's expungement-of-records statute, *N.J.S.A.* 2C:52–1 to –32, is intended to provide "relief to the one-time offender who has led a life of rectitude and disassociated himself with unlawful activity." *N.J.S.A.* 2C:52–32. The relief provided by the ex-

pungement statute, however, does not include the wholesale rewriting of history.

A person convicted of a first-time crime may petition for expungement of "all records and information" relating to the conviction after the passage of ten years "from the date of [the] conviction, payment of fine, satisfactory completion of probation or parole, or release from incarceration, whichever is later." *N.J.S.A.* 2C:52–2(a). A court order of expungement does not result in the destruction of criminal records. Rather, the records described in the expungement order must be removed from the files of any government agency that is given notice of the expungement petition in accordance with *N.J.S.A.* 2C:52–15.[8] The expunged records then must be isolated and placed in the control of a designated person within that agency. *Ibid.*; *see also N.J.S.A.* 2C:52–1(a). Generally, "[i]n response to requests for information or records" regarding the conviction, the agency is required to respond that "there is no record information." *N.J.S.A.* 2C:52–15.

There are a number of exceptions to this general rule. For example, expunged records may be used in matters relating to decisions about diversion into a supervisory program, to the setting of bail, to the imposition of sentence, to parole decisions, and to a correctional facility's classification decisions. *N.J.S.A.* 2C:52–17 to –23, –27. Moreover, although typically an offender whose record has been expunged can respond in the negative to a

---

[8] The government agencies on which an expungement petition must be served are:

> the Superintendent of State Police; the Attorney General; the county prosecutor of the county wherein the court is located; the chief of police or other executive head of the police department of the municipality wherein the offense was committed; the chief law enforcement officer of any other law enforcement agency of this State which participated in the arrest of the individual; the superintendent or warden of any institution in which the petitioner was confined; and, if a disposition was made by a municipal court, upon the magistrate of that court.
> [*N.J.S.A.* 2C:52–10.]

question asking him if he has been convicted of a crime, here too there are exceptions. *See N.J.S.A.* 2C:52–27. He must reveal the fact of his conviction if "seeking employment within the judicial branch or with a law enforcement or corrections agency." *Ibid.*

For purposes of the present case, perhaps the most pertinent exception to the expungement statute's cloak of confidentiality is *N.J.S.A.* 2C:52–19. That section permits the inspection of expunged records if the Superior Court finds "good cause shown and compelling need based on specific facts," and "only in those instances where the subject matter of the records of arrest or conviction is the object of litigation or judicial proceedings." *Ibid.* Thus, in this case, if truth is a defense to a defamation action based on the publication of information contained in expunged records, this section ostensibly empowers a court to give defendants access to those records to establish the truth of their assertions. *See State v. J.R.S.,* 398 *N.J.Super.* 1, 6, 939 *A.*2d 226 (App.Div.2008) ("Even after the entry of a judgment of expungement, [expunged] records remain available for certain limited purposes, including to satisfy discovery obligations in a civil suit." (citing *N.J.S.A.* 2C:52–19)).

B.

To support his position that expunged records should not be used to support truth as a defense in a defamation action, G.D. takes out of context the 1960 statement of Governor Meyner vetoing an amendment to a prior and completely different version of the current expungement statute. At the time of the Governor's veto, the expungement statute then in place provided only for the expungement of "evidence of [the criminal] conviction." *See L.* 1931, *c.* 345, §§ 1 to 3; *L.* 1936, *c.* 174, §§ 2, 3. The Legislature attempted to amend that statute to include expungement of records in cases in which charges and complaints were dismissed or withdrawn. Assemb. 480, 184th Leg. (N.J.1959). On the occasion of issuing his veto, Governor Meyner stated in part:

[T]he order would only expunge records in the court where the complaint was filed; a criminal complaint can and does generate a host of records in other places, and these would remain in existence but robbed of the official record to sustain them.... In what way would any newspaper accounts of the charge, or the personal recollections of those involved, be expunged? Suppose one with personal knowledge of the event were to declare its occurrence, and be sued for defamation; where would he get proof of the truth if the record were gone?

[Governor's Statement to Assemb. No. 480, 184th Leg. (N.J.1960).]

Nothing in that veto statement supports G.D.'s argument. Indeed, the portion of Governor Meyner's written remarks not quoted by G.D. is entirely antithetical to his position, for the Governor also said that "*mere expungement of the record does not serve to erase the fact itself.*" *Ibid.* (emphasis added). That last statement suggests that the Governor understood that a plaintiff could not file a defamation action and claim that a "fact" was no longer a "fact" simply because a record was expunged. The current version of the expungement statute, particularly *N.J.S.A.* 2C:52–19, which seemingly would permit access to expunged information in a defamation action, directly addresses the concerns so presciently raised by Governor Meyner.

## C.

As can be seen, the expungement statute does not obliterate the record of a conviction. In specifically defined circumstances, a government agency subject to the expungement order may release information concerning the expunged record, and a convicted offender is required to answer truthfully about his past. Moreover, the breadth of the expungement statute—on its face—is limited to those government agencies that are statutorily required to be served with the expungement order. *See N.J.S.A.* 2C:52–10, –15.

On that basis, in *E.A. v. New Jersey Real Estate Commission,* the Appellate Division rejected the argument that the expungement statute compelled the New Jersey Real Estate Commission and New Jersey Department of Insurance to remove from their files information concerning the expunged conviction of a realtor whose license was suspended and later restored pursuant to the

Rehabilitated Convicted Offenders Act, *N.J.S.A.* 2A:168A–1 *et seq.* 208 *N.J.Super.* 65, 66–67, 504 *A.*2d 1213 (App.Div.1986). In limiting the reach of the statute, the Appellate Division distinguished a state licensing agency from the statutorily named law enforcement agencies and courts required to isolate and remove expunged records. *Id.* at 68, 504 *A.*2d 1213. The issue raised in *E.A.*—whether other state agencies might be subject to the expungement statute—is not before us.

However, no one has argued that a newspaper that has reported on the arrest or conviction of a person whose record is later expunged must excise from its archives a past story or, similarly, that the New Jersey judiciary must razor from the bound volumes of its reporters a published case. Common sense tells us that an arrest or conviction may become general knowledge within a community and that people will not banish from their memories stored knowledge even if they become aware of an expungement order. And long before the entry of an expungement order, information about an arrest and conviction may be compiled by data aggregators and disseminated to companies interested in conducting background checks. *See Report of the Supreme Court Special Committee on Public Access to Court Records* 32, 46, 53 (2007). Through the internet, today, information is transmitted instantaneously to countless recipients everywhere around the globe. *Id.* at 38–39. All of the beneficial purposes of the expungement statute, and the protections it provides, will not allow a person to fully escape from his past. The expungement statute— enacted at a time when law enforcement and court documents may have been stored in the practical obscurity of a file room—now must coexist in a world where information is subject to rapid and mass dissemination.

In arguing both that truth is not a defense to a defamation claim when the disclosure—even if substantially accurate—is of an expunged record and that an expunged record should be accorded a reasonable expectation of privacy, G.D. turns our attention to *N.J.S.A.* 2C:52–30. That provision—subject to specific statutory

exceptions—makes the impermissible disclosure of an expunged record a violation of New Jersey's Code of Criminal Justice. *Ibid.* It is a disorderly—persons offense if one "reveals to another the existence of an arrest, conviction or related legal proceeding *with knowledge* that the records and information pertaining thereto have been expunged." *Ibid.* (emphasis added). G.D. basically argues that even if defendants lawfully acquired his criminal-conviction information, if they published that information knowing that it was expunged, defendants have committed an offense. By his reasoning, *N.J.S.A.* 2C:52–30 supports his position that the truth of an expunged offense cannot be a defense in a defamation action.

In disposing of the issues before us, we cannot avoid addressing this statute. The most extreme reading of *N.J.S.A.* 2C:52–30 would criminalize truthful speech on matters of public interest and concern. Although those employed in certain statutorily named government agencies that have custody of expunged records are clearly bound by *N.J.S.A.* 2C:52–30, a literal and overly broad reading of that statute likely would violate free-speech rights guaranteed under the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution.[9]

 The publication of truthful information lawfully obtained is protected from criminal prosecution by the First Amendment except in the rarest of circumstances. *Florida Star v. B.J.F.,* 491 *U.S.* 524, 532, 109 *S.Ct.* 2603, 2608–09, 105 *L.Ed.*2d 443, 454–55 (1989); *Near v. Minnesota,* 283 *U.S.* 697, 716, 51 *S.Ct.* 625, 631, 75 *L.Ed.* 1357, 1367 (1931) ("No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the

---

[9] The First Amendment of the United States Constitution provides: "Congress shall make no law ... abridging the freedom of speech...." Article I, Paragraph 6 of the New Jersey Constitution provides in pertinent part:

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.

number and location of troops."). In *Smith v. Daily Mail Publishing Co.,* 443 *U.S.* 97, 98–100, 99 *S.Ct.* 2667, 2668–69, 61 *L.Ed.*2d 399, 402–03 (1979), two newspapers published the names of juvenile offenders in violation of a state statute that prohibited the publication of such information. The United States Supreme Court held that, consistent with the First Amendment, a state could not "punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper." *Id.* at 105–06, 99 *S.Ct.* at 2672, 61 *L.Ed.*2d at 406; *see also Florida Star, supra,* 491 *U.S.* at 541, 109 *S.Ct.* at 2613, 105 *L.Ed.*2d at 460 ("We hold only that where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order . . . .").

In construing a statute susceptible of two possible meanings—one constitutional and one not—we are enjoined by our canons of statutory interpretation and by prudence to choose the one that is constitutional. *State v. Miller,* 170 *N.J.* 417, 433, 790 *A.*2d 144 (2002) (citations omitted). We cannot conceive that the Legislature intended to punish, under our Criminal Code, persons who have spoken truthfully about lawfully acquired information long contained in public records, even if they *know* of the existence of an expungement order. We cannot conclude that *N.J.S.A.* 2C:52–30 transforms political debate between neighbors and friends and discourse on matters of public interest into disorderly conduct, just because the subject of the discussion is contained in a record known to be expunged.

## V.

### A.

In light of common-law and constitutional principles protecting free speech, and with the expungement statute as a backdrop, we hold that the traditionally recognized defense of truth to a defamation action was not lost in this case because of the existence of an expungement order. Other jurisdictions have

come to the same conclusion with respect to their own expungement statutes.

For example, the Massachusetts sealed-records statute does not contain a specific exception allowing for the use of information in a sealed record as a defense in a defamation action.[10] *See Mass. Gen. Laws* ch. 276, § 100A. Nevertheless, the Supreme Judicial Court of Massachusetts has held that "the sealed records statute does not operate to erase the fact of a prior conviction; it seeks simply to ensure confidentiality." *Rzeznik, supra,* 373 *N.E.*2d at 1133 (internal citations omitted). The Massachusetts high court stated that "[t]here is nothing in the statute or the legislative history to suggest that, once the fact of a conviction is sealed, it becomes nonexistent, and hence untrue for the purposes of the common law of defamation." *Ibid.*

In *Bahr, supra,* 624 *P.*2d at 665–66, a newspaper published an article revealing the embezzlement conviction of a candidate for public office. The candidate sued for defamation on the basis that his conviction had been expunged. *Id.* at 666. Under the Oregon expungement statute, truth is a defense in a defamation action. *Ibid.* The Oregon Court of Appeals held that while the candidate "was entitled to deny his conviction" under the expungement statute, the newspaper "was entitled to rely upon the fact that a conviction did occur as a defense" under that law. *Id.* at 666–67. The Oregon court noted that the expungement "statute authorizes certain persons to misrepresent their own past. It does not make that representation true." *Id.* at 666. Accordingly, the expungement statute did not "impose any duty on members of the public who are aware of the conviction to pretend that it does not exist." *Ibid.*

### B.

We now apply the principles discussed above to the present case.

---

[10] Massachusetts's records-sealing statute is the equivalent of New Jersey's expungement statute. *See Mass. Gen. Laws* ch. 276, § 100A.

In 1993, in open court, G.D. pled guilty to the second-degree offense of possession with intent to distribute cocaine and was sentenced to a five-year state-prison term. For thirteen years information concerning that conviction was a public record. Even after G.D. obtained the order expunging his criminal record in 2006, his conviction evidently was still posted on the Department of Corrections' website and remained there as late as August 21, 2008.[11] Defendants printed and disseminated the campaign flyers in May 2007.

It is true that under the expungement statute, as a matter of law, an expunged conviction is "deemed not to have occurred," *N.J.S.A.* 2C:52–27. But the expungement statute does not transmute a once-true fact into a falsehood. It does not require the excision of records from the historical archives of newspapers or bound volumes of reported decisions or a personal diary. It cannot banish memories. It is not intended to create an Orwellian scheme whereby previously public information—long maintained in official records—now becomes beyond the reach of public discourse on penalty of a defamation action. Although our expungement statute generally permits a person whose record has been expunged to misrepresent his past, it does not alter the metaphysical truth of his past, nor does it impose a regime of silence on those who know the truth.

Significantly, in this case, the campaign flyers were intended to inform the electorate about the character of previous public-officeholder appointments made by a candidate for State Senate.

---

[11] The language of the 2006 expungement order prepared by G.D. did not direct by name the Department of Corrections to comply with that order. G.D. has argued that simply because the record of his conviction was on the Department of Corrections' website on August 21, 2008, does not mean that it was available on the website between the date of expungement, June 12, 2006, and August 2008. The suggestion that G.D.'s criminal-conviction information was posted on the Department of Corrections' website only in August 2008 seems rather farfetched. Nevertheless, whether the criminal-conviction information was posted on the Department's website at the time the flyers were disseminated is not dispositive of any issue in this case.

We do not sit as screeners of the good taste of campaign literature. We understand that past offenders who have had their records expunged look forward to placing their mistakes behind them and having a new start in life, and that society benefits from their rehabilitation. Nevertheless, G.D.'s background and association with a candidate for public office became fodder for a political campaign.

 The right to speak freely on matters of public concern and the right to criticize a candidate for public office implicate core values protected by our federal and state constitutions. *See Buckley v. Valeo*, 424 *U.S.* 1, 14–15, 96 *S.Ct.* 612, 632, 46 *L.Ed.*2d 659, 685 (1976); *Mills v. Alabama*, 384 *U.S.* 214, 218–19, 86 *S.Ct.* 1434, 1437, 16 *L.Ed.*2d 484, 488 (1966). The right to free speech allows for an "uninhibited, robust, and wide-open" discussion of public issues that "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 270, 84 *S.Ct.* 710, 721, 11 *L.Ed.*2d 686, 701 (1964). In particular, "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." *Buckley, supra*, 424 *U.S.* at 14, 96 *S.Ct.* at 632, 46 *L.Ed.*2d at 685.

Truth may be personally embarrassing and offensive to some, but it remains a defense in a defamation action, even when the truth revealed concerns information contained in an expunged record. Here, for purposes of the defamation action, it would make no difference that the speaker knew of the expungement order or how he obtained it. To be sure, we are not saying that a government employee bound by an expungement order, or an accomplice, is not subject to liability under the Code of Criminal Justice for an unlawful disclosure of expunged information.[12]

---

[12] We do not suggest that if a person *unlawfully* obtained the criminal-conviction information from an agency that was required to keep secret the

## C.

Moreover, truth is a defense to a defamation action even if a report on a matter of public concern contains minor inaccuracies. *See Salzano, supra,* 201 *N.J.* at 523, 993 *A.*2d 778. But a statement that is not substantially accurate, a statement whose "substance," "gist," and "sting" cannot be justified will not be protected under the shield of truth. *Masson, supra,* 501 *U.S.* at 517, 111 *S.Ct.* at 2433, 115 *L.Ed.*2d at 472 (citations omitted). Plaintiff G.D. bears the burden of proving that the defamatory statements were not substantially accurate and therefore false. *See DeAngelis, supra,* 180 *N.J.* at 13, 847 *A.*2d 1261; *see also Costello v. Ocean County Observer,* 136 *N.J.* 594, 625, 643 *A.*2d 1012 (1994) ("For a report to be characterized as fair and true, it should be enough that the content of the article be substantially accurate.").

Therefore, through the lens of the summary-judgment standard, we must determine whether the campaign flyers were not substantially true or, in other words, substantially accurate. At this stage, as an appellate court, we must view the facts as did the trial court—"in the light most favorable to the non-moving party," G.D. *See Bauer v. Nesbitt,* 198 *N.J.* 601, 604–05 n. 1, 969 *A.*2d 1122 (2009) (citations omitted). Significantly, the adverse party to the summary-judgment motion "may not rest upon the mere allegations or denials of the pleading, but must respond by affidavits . . . setting forth specific facts showing that there is a genuine issue for trial." *R.* 4:46–5(a).

On the one hand, in deciding whether to grant summary judgment, a court should proceed cautiously when presented with an incomplete record. *See Salomon v. Eli Lilly & Co.,* 98 *N.J.* 58, 61, 484 *A.*2d 320 (1984). On the other hand, a timely grant of summary judgment in a defamation action has the salutary effect of discouraging frivolous lawsuits that might chill

---

expunged record, e.g., through bribery, a prosecution could not be undertaken pursuant to *N.J.S.A.* 2C:52–30 or another statute within our Criminal Code.

the exercise of free speech on matters of public concern. *See Rocci v. Ecole Secondaire Macdonald–Cartier,* 165 *N.J.* 149, 158, 755 *A.*2d 583 (2000) (citing *Dairy Stores, Inc. v. Sentinel Publ'g Co.,* 104 *N.J.* 125, 157, 516 *A.*2d 220 (1986)); *see also DeAngelis, supra,* 180 *N.J.* at 12, 847 *A.*2d 1261 ("The summary judgment standard is encouraged in libel and defamation actions because '[t]he threat of prolonged and expensive litigation has a real potential for chilling ... criticism and comment upon public figures and public affairs.' " (alterations in original) (quoting *Kotlikoff v. Cmty. News,* 89 *N.J.* 62, 67, 444 *A.*2d 1086 (1982))).

Here, no interrogatory answers were completed or depositions taken. The record consists of conflicting affidavits and attached documents. G.D. avers in a certification that the campaign flyers "regarding [his] criminal record are false, based upon the June 12, 2006 Order of Expungement." As we have explained, an expungement does not make untruthful the recitation of historical facts in the campaign flyers. Alternatively, G.D. claims that the references to his criminal conviction in the campaign flyers were substantially inaccurate.

One of the campaign flyers stated that G.D. was "a DRUG DEALER who went to JAIL for FIVE YEARS for selling coke near a public school." [13] G.D. certifies that this statement is false because he "was never convicted of 'selling coke near a school.' " However, the flyer merely says that G.D. went to jail for "selling coke near a public school," not that he was convicted of the offense of "selling coke near a public school." G.D. cannot deny that he was convicted of possessing cocaine with the intent to distribute it. Moreover, he does not directly deny in his certification that the drug offense occurred near a public school or that his jail sentence sprung from those facts.[14] In opposition to defendants' motion for

---

[13] In their statement of undisputed facts, the Shaftans assert that G.D.'s "arrest occurred within 1000 [feet] of a school."

[14] The Appellate Division did not consider the flyer's reference to "near a school" to be misleading or unfair. *G.D., supra,* 411 *N.J.Super.* at 193, 984 *A.*2d

summary judgment, G.D. was required to "set[ ] forth specific facts showing that there is a genuine issue for trial." *R.* 4:46–5(a). He has failed to do so.

To be clear, G.D. pled guilty to possessing with *intent to distribute* a substantial quantity of cocaine and was sentenced to a five-year prison term. G.D.'s guilty plea was an admission that he did not possess the illicit drugs for his own personal consumption. The relevant provision of the Code of Criminal Justice, *N.J.S.A.* 2C:35–5, proscribes both distribution and possession with intent to distribute controlled dangerous substances (CDS). The statutory language does not have a distinct category that prohibits selling or possessing with intent to sell CDS. It would be fair and reasonable to infer that a person who admitted to having the intent to distribute cocaine from a large cache was not acting for eleemosynary purposes. We also find that the reference to G.D. as a drug dealer is not inconsistent with the criminal charge to which G.D. pled guilty—possession with intent to distribute. That would be a fair report—substantial truth—based on a review of the judgment of conviction.

Last, G.D. certifies that he did not "go to jail for five years." While it may be true that G.D. did not serve five years in state prison, he was sentenced to prison for five years, regardless of when he was released on parole. As a matter of law, we conclude that the campaign flyer's statement that G.D. "went to jail for five years" is, at the very least, substantially accurate, however imprecise the flyer's language may be. Certainly, the "substance," "gist," and "sting" of that statement when measured against G.D.'s sentence cannot serve as the basis for a claim of falsity in a defamation action.

---

921. The panel took judicial notice that Union City—the identified locale of the drug offense—is a compact urban community with twelve schools. *Ibid.* Given our disposition of this issue, we need not address whether the Appellate Division's taking judicial notice of where schools were located in Union City more than a dozen years ago was appropriate.

In short, in response to the summary-judgment motion, G.D. was required to affirmatively assert that the words used in the flyers were not substantially true. Because G.D. has not done so and has failed to raise a genuine issue of material fact regarding the truthfulness of the assertions in the flyers, we affirm the Appellate Division's grant of summary judgment on the defamation action.

## VI.

### A.

We now address the related tort claims alleged in G.D.'s complaint that flow from the publication of the campaign flyers. The intentional- and negligent-infliction-of-emotional-distress claims also fail because those torts are predicated on the same conduct alleged in the defamation claim. At least in the circumstance here, there is "a certain symmetry or parallel between claims of emotional distress and defamation that calls for consistent results." *See Decker v. Princeton Packet, Inc.,* 116 *N.J.* 418, 432, 561 *A.*2d 1122 (1989). In this case, the challenged speech was not only true or substantially true, but also directly touched on a matter of public interest and concern. Because the emotional-distress and defamation claims are so closely linked together, "it comports with first amendment protections to deny an emotional-distress claim based on" a publication that does not constitute defamation. *See ibid.* G.D. cannot proceed on a claim of intentional or negligent infliction of emotional distress based on campaign flyers that do not give rise to a defamation action.

### B.

We also agree that the Appellate Division properly dismissed on summary judgment G.D.'s false-light claim. New Jersey recognizes a privacy tort when "[o]ne . . . gives publicity to a matter concerning another that places the other before the public in a false light." *Romaine, supra,* 109 *N.J.* at 294, 537 *A.*2d

284 (alterations in original) (citing *Restatement (Second) of Torts, supra,* § 652E). It is not necessary to detail all of the elements of this cause of action. It is enough to say that "a fundamental requirement of the false light tort is that the disputed publicity be in fact false, or else at least have the capacity to give rise to a false public impression as to the plaintiff." *Ibid.* (internal quotation marks and citation omitted). In other words, a false-light claim requires that the offending party make "a major misrepresentation of plaintiff's character, history, activities, or beliefs." *Id.* at 295, 537 *A.*2d 284 (alteration and quotation omitted).

Because G.D.'s arguments in support of his false-light claim are essentially the same as those he advances on his defamation claim, the result can be no different. As we said earlier, although the expungement statute permits G.D. to misrepresent his past, defendants were not required to do so. The expungement statute is intended to remove various civil disabilities and to promote an offender's reintegration into society; it does not alter historical facts for either a defamation or false-light action. Moreover, the campaign flyers contained substantially accurate statements about his criminal conviction.[15] This is not a case in which a defendant widely publicizes that a plaintiff was charged with a criminal offense but knowingly did not mention that the charge was found to be baseless. In that circumstance, publication of the unadorned criminal charge might give rise to the false impression that the plaintiff was convicted. *See Reilly v. Gillen,* 176 *N.J.Super.* 321, 326–29, 423 *A.*2d 311 (App.Div.1980) (affirming libel judgment for

---

[15] G.D. did not argue before the trial court or Appellate Division that any of his claims were premised on defendants' failure to include in the campaign flyers that his criminal conviction had been expunged. Only in a footnote in his petition for certification does he glancingly make reference to such an issue concerning his false-light claim. Therefore, we do not address that issue. *See N.J. Div. Youth & Family Servs. v. M.C.,* 201 *N.J.* 328, 339, 990 *A.*2d 1097 (2010) ("[I]ssues not raised below will ordinarily not be considered on appeal...."). G.D.'s primary arguments were that (1) the criminal conviction should not have been mentioned in the campaign flyers and that (2) the information posted was not substantially accurate.

defendants' 1977 recirculation of 1954 article, which detailed civil complaints but did not mention dismissal of those complaints).

Politics is not a parlor game. The point brutally driven home in the flyers was that in 2000—six years before G.D. obtained an expungement of his criminal conviction—an elected official appointed to his staff a person with a drug conviction. The attack was on that official then seeking a higher office. In the political shootout, G.D. was caught in the cross-fire.

Here, defendants published facts that were true and therefore G.D. cannot succeed on his claim that he was cast in a false light.

## C.

We now turn to G.D.'s remaining privacy torts: invasion of privacy, improper publication of private facts, and misappropriation of G.D.'s name and image.

The tort of invasion of privacy is defined as an intentional intrusion, "physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" that "would be highly offensive to a reasonable person." *Bisbee v. John C. Conover Agency, Inc.*, 186 *N.J.Super.* 335, 339, 452 *A.*2d 689 (1982) (quoting *Restatement (Second) of Torts, supra*, § 652B). The tort of improper publication of private facts occurs "when it is shown that 'the matters revealed were actually private, that dissemination of such facts would be offensive to a reasonable person, and that there is no legitimate interest of the public in being apprised of the facts publicized.'" *Romaine, supra*, 109 *N.J.* at 297, 537 *A.*2d 284 (quoting *Bisbee, supra*, 186 *N.J.Super.* at 340, 452 *A.*2d 689). To succeed in proving that defendants committed either of those torts, G.D. must establish that he possessed a reasonable expectation of privacy in matters and concerns that are contained in his expunged criminal-conviction record. *See id.* at 297–99; *Bisbee, supra*, 186 *N.J.Super.* at 339–41, 452 *A.*2d 689. That he cannot do.

██ G.D. pled guilty and was sentenced in a courtroom that was open to the public. The judgment of conviction in G.D.'s case was a court record available to the public for thirteen years before the entry of the expungement order. During all those years, the information concerning G.D.'s conviction was available to commercial data companies as well as to newspapers and other public organizations. The reality is that criminal-conviction information is disseminated well before the entry of an expungement order. *Report of the Supreme Court Special Committee on Public Access to Court Records, supra,* at 46. Moreover, "once the Judiciary has made information available to a requester, it no longer has control of that information." *Ibid.* Indeed, in the Public–Access–to–Court–Records report, we recognized that the "expungement of criminal records could become meaningless since previously released conviction information is published in databases which the Judiciary has no power to update or correct." *Id.* at 53; *cf.* Asbury Park Press, http://php.app.com/njsent/search.php (last visited Jan. 14, 2011) (posting criminal-conviction information online). Additionally, at the time of the dissemination of the campaign flyers, G.D.'s conviction data was posted on the Department of Corrections' website. G.D.'s conviction was not a hidden secret; the expungement did not expurgate his past.

A number of courts have found that an offender has no protected privacy interest in expunged criminal records. *See, e.g., Eagle v. Morgan,* 88 *F.*3d 620, 625–26 (8th Cir.1996); *Nilson v. Layton City,* 45 *F.*3d 369, 372 (10th Cir.1995); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 812 *F.*2d 105, 117 & n. 8 (3d Cir.1987); *White v. Thomas,* 660 *F.*2d 680, 686 (5th Cir.1981); *Puricelli v. Borough of Morrisville,* 820 *F.Supp.* 908, 918 (E.D.Pa. 1993), *aff'd o.b.,* 26 *F.*3d 123 (3d Cir.), *cert. denied,* 513 *U.S.* 930, 115 *S.Ct.* 321, 130 *L.Ed.*2d 282 (1994). With regard to New Jersey's expungement statute, the United States Court of Appeals for the Third Circuit has noted that "because expungement is available only after a minimum statutory period of ten years has elapsed, and because references to a defendant's criminal conduct may persist in public news sources after expungement, the infor-

mation expunged is never truly 'private.' " *Nunez v. Pachman*, 578 *F*.3d 228, 229 (3d Cir.2009).[16] The Eighth Circuit has recognized that an expungement statute cannot "permanently erase from the public record those affairs that take place in open court," and that "no governmental body holds the power to nullify [a] historical fact." *Eagle, supra*, 88 *F*.3d at 626–27.

This is not a case in which a defendant peered through closed curtains into a bedroom or wrongly acquired a personal diary and made highly private information available to the public. A person has a reasonable expectation of privacy in the sanctity of his or her bedroom and personal diary from peeping toms intent on making private facts titillating fodder for the public. This case, however, deals with public acts, a guilty plea and sentence in a public courtroom, and public facts, court records available to the public over many years.

We hold that the expungement order did not and could not create a reasonable expectation of privacy in matters so long in the public domain. Accordingly, the Appellate Division correctly entered summary judgment on those claims.

 We also conclude that defendants did not commit the tort of misappropriation of G.D.'s name and image because the use of his name and image in the campaign flyers was not for a commercial purpose directly benefiting defendants. *See Bisbee, supra*, 186 *N.J.Super.* at 342, 452 *A*.2d 689 (citing *Restatement (Second) of Torts, supra*, § 652C) (holding that only when plaintiff's name or likeness is appropriated for defendant's commercial benefit is right to privacy invaded). That the Shaftan defendants are in the business of public relations and marketing and prepared the campaign flyers does not make publication of the flyers a publication in the commercial sense. *See ibid.* (citing *Restatement (Second) of Torts, supra*, § 652C comment d). The campaign

---

[16] The Third Circuit declined to consider whether an individual has a reasonable expectation of privacy in expunged criminal records as a matter of state constitutional law. *Nunez, supra*, 578 *F*.3d at 229.

flyers represented political speech attacking the judgment of a candidate running for public office. This is the type of speech that is at the heart of First Amendment guarantees. *See Buckley, supra,* 424 *U.S.* at 14–15, 96 *S.Ct.* at 632, 46 *L.Ed.*2d at 685. "That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." *Time, Inc. v. Hill,* 385 *U.S.* 374, 397, 87 *S.Ct.* 534, 546, 17 *L.Ed.*2d 456, 472 (1967) (quotation omitted).

G.D. cannot show that the use of his name and image constitutes the tort of misappropriation of one's name and image for a wrongful purpose.

### D.

Last, G.D. claims that defendants engaged in a civil conspiracy by "acting in concert to commit an *unlawful* act" or by entering into an agreement "to inflict a *wrong* against or injury upon" him. *See Banco Popular N. Am. v. Gandi,* 184 *N.J.* 161, 177, 876 *A.*2d 253 (2005) (quotation omitted) (emphasis added). However, for reasons already expressed, G.D. cannot establish that defendants committed an unlawful act or a wrong against him that constitutes a tort entitling him to a recovery. Therefore, G.D.'s civil-conspiracy claim must also be dismissed.

### VII.

In summary, we conclude that truth is a defense to G.D.'s defamation action, despite the expungement of the record of his conviction. We also conclude that G.D. cannot claim that he possessed a reasonable expectation of privacy about information long in the public domain: a guilty plea entered and sentence imposed in a public courtroom and recorded in documents kept in the courthouse for more than thirteen years. We therefore affirm the Appellate Division, which granted summary judgment in favor of defendants and dismissed plaintiff's complaint in its entirety.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS, and Judge STERN (temporarily assigned)—7.

*Opposed*—None.

